Chief Justice ROBERTS delivered the opinion of the Court.
*764 The International Organizations Immunities Act of 1945 grants international organizations such as the World Bank and the World Health Organization the "same immunity from suit ... as is enjoyed by foreign governments."
*765 22 U.S.C. § 288a(b). At the time the IOIA was enacted, foreign governments enjoyed virtually absolute immunity from suit. Today that immunity is more limited. Most significantly, foreign governments are not immune from actions based upon certain kinds of commercial activity in which they engage. This case requires us to determine whether the IOIA grants international organizations the virtually absolute immunity foreign governments enjoyed when the IOIA was enacted, or the more limited immunity they enjoy today.
Respondent International Finance Corporation is an international organization headquartered in the United States. The IFC finances private-sector development projects in poor and developing countries around the world. About 10 years ago, the IFC financed the construction of a power plant in Gujarat, India. Petitioners are local farmers and fishermen and a small village. They allege that the power plant has polluted the air, land, and water in the surrounding area. Petitioners sued the IFC for damages and injunctive relief in Federal District Court, but the IFC claimed absolute immunity from suit. Petitioners argued that the IFC was entitled under the IOIA only to the limited or "restrictive" immunity that foreign governments currently enjoy. We agree.
I
A
In the wake of World War II, the United States and many of its allies joined together to establish a host of new international organizations. Those organizations, which included the United Nations, the International Monetary Fund, and the World Bank, were designed to allow member countries to collectively pursue goals such as stabilizing the international economy, rebuilding war-torn nations, and maintaining international peace and security.
Anticipating that those and other international organizations would locate their headquarters in the United States, Congress passed the International Organizations Immunities Act of 1945, 59 Stat. 669. The Act grants international organizations a set of privileges and immunities, such as immunity from search and exemption from property taxes. 22 U.S.C. §§ 288a(c), 288c.
The IOIA defines certain privileges and immunities by reference to comparable privileges and immunities enjoyed by foreign governments. For example, with respect to customs duties and the treatment of official communications, the Act grants international organizations the privileges and immunities that are "accorded under similar circumstances to foreign governments." § 288a(d). The provision at issue in this case provides that international organizations "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." § 288a(b).
The IOIA authorizes the President to withhold, withdraw, condition, or limit the privileges and immunities it grants in light of the functions performed by any given international organization. § 288. Those privileges and immunities can also be expanded or restricted by a particular organization's founding charter.
B
When the IOIA was enacted in 1945, courts looked to the views of the Department of State in deciding whether a given foreign government should be granted immunity from a particular suit. If the Department submitted a recommendation on immunity, courts deferred to the recommendation. If the Department did not make a recommendation, courts decided for themselves whether to grant immunity, *766 although they did so by reference to State Department policy. Samantar v. Yousuf , 560 U.S. 305, 311-312, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010).
Until 1952, the State Department adhered to the classical theory of foreign sovereign immunity. According to that theory, foreign governments are entitled to "virtually absolute" immunity as a matter of international grace and comity. At the time the IOIA was enacted, therefore, the Department ordinarily requested, and courts ordinarily granted, immunity in suits against foreign governments. Ibid . ; Verlinden B. V. v. Central Bank of Nigeria , 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).[1]
In 1952, however, the State Department announced that it would adopt the newer "restrictive" theory of foreign sovereign immunity. Under that theory, foreign governments are entitled to immunity only with respect to their sovereign acts, not with respect to commercial acts. The State Department explained that it was adopting the restrictive theory because the "widespread and increasing practice on the part of governments of engaging in commercial activities" made it "necessary" to "enable persons doing business with them to have their rights determined in the courts." Letter from Jack B. Tate, Acting Legal Adviser, Dept. of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984-985 (1952).
In 1976, Congress passed the Foreign Sovereign Immunities Act. The FSIA codified the restrictive theory of foreign sovereign immunity but transferred "primary responsibility for immunity determinations from the Executive to the Judicial Branch." Republic of Austria v. Altmann , 541 U.S. 677, 691, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) ; see 28 U.S.C. § 1602. Under the FSIA, foreign governments are presumptively immune from suit. § 1604. But a foreign government may be subject to suit under one of several statutory exceptions. Most pertinent here, a foreign government may be subject to suit in connection with its commercial activity that has a sufficient nexus with the United States. § 1605(a)(2).
C
The International Finance Corporation is an international development bank headquartered in Washington, D. C. The IFC is designated as an international organization under the IOIA. Exec. Order No. 10680, 3 C.F.R. 86 (1957); see 22 U.S.C. §§ 282, 288. One hundred eighty-four countries, including the United States, are members of the IFC.
The IFC is charged with furthering economic development "by encouraging the growth of productive private enterprise in member countries, particularly in the less developed areas, thus supplementing the activities of" the World Bank. Articles of Agreement of the International Finance Corporation, Art. I, Dec. 5, 1955, 7 U.S.T. 2193, T. I. A. S. No. 3620. Whereas the World Bank primarily provides loans and grants to developing countries for public-sector projects, the IFC finances private-sector development projects that cannot otherwise attract capital on reasonable terms. See Art. I(i), ibid . In 2018, the IFC
*767 provided some $ 23 billion in such financing.
The IFC expects its loan recipients to adhere to a set of performance standards designed to "avoid, mitigate, and manage risks and impacts" associated with development projects. IFC Performance Standards on Environmental and Social Sustainability, Jan. 1, 2012, p. 2, ¶1. Those standards are usually more stringent than any established by local law. The IFC includes the standards in its loan agreements and enforces them through an internal review process. Brief for Respondent 10.
In 2008, the IFC loaned $ 450 million to Coastal Gujarat Power Limited, a company located in India. The loan helped finance the construction of a coal-fired power plant in the state of Gujarat. Under the terms of the loan agreement, Coastal Gujarat was required to comply with an environmental and social action plan designed to protect areas around the plant from damage. The agreement allowed the IFC to revoke financial support for the project if Coastal Gujarat failed to abide by the terms of the agreement.
The project did not go smoothly. According to the IFC's internal audit, Coastal Gujarat did not comply with the environmental and social action plan in constructing and operating the plant. The audit report criticized the IFC for inadequately supervising the project.
In 2015, a group of farmers and fishermen who live near the plant, as well as a local village, sued the IFC in the United States District Court for the District of Columbia. They claimed that pollution from the plant, such as coal dust, ash, and water from the plant's cooling system, had destroyed or contaminated much of the surrounding air, land, and water. Relying on the audit report, they asserted several causes of action against the IFC, including negligence, nuisance, trespass, and breach of contract. The IFC maintained that it was immune from suit under the IOIA and moved to dismiss for lack of subject matter jurisdiction.
The District Court, applying D. C. Circuit precedent, concluded that the IFC was immune from suit because the IOIA grants international organizations the virtually absolute immunity that foreign governments enjoyed when the IOIA was enacted. 172 F.Supp.3d 104, 108-109 (DC 2016) (citing Atkinson v. Inter-American Development Bank , 156 F.3d 1335 (CADC 1998) ). The D. C. Circuit affirmed in light of its precedent. 860 F.3d 703 (2017). Judge Pillard wrote separately to say that she would have decided the question differently were she writing on a clean slate. Id ., at 708 (concurring opinion). Judge Pillard explained that she thought the D. C. Circuit "took a wrong turn" when it "read the IOIA to grant international organizations a static, absolute immunity that is, by now, not at all the same 'as is enjoyed by foreign governments,' but substantially broader." Ibid . Judge Pillard also noted that the Third Circuit had expressly declined to follow the D. C. Circuit's approach. See OSS Nokalva, Inc. v. European Space Agency , 617 F.3d 756 (CA3 2010).
We granted certiorari. 584 U.S. ----, 138 S.Ct. 2026, 201 L.Ed.2d 277 (2018).
II
The IFC contends that the IOIA grants international organizations the "same immunity" from suit that foreign governments enjoyed in 1945. Petitioners argue that it instead grants international organizations the "same immunity" from suit that foreign governments enjoy today. We think petitioners have the better reading of the statute.
*768 A
The language of the IOIA more naturally lends itself to petitioners' reading. In granting international organizations the "same immunity" from suit "as is enjoyed by foreign governments," the Act seems to continuously link the immunity of international organizations to that of foreign governments, so as to ensure ongoing parity between the two. The statute could otherwise have simply stated that international organizations "shall enjoy absolute immunity from suit," or specified some other fixed level of immunity. Other provisions of the IOIA, such as the one making the property and assets of international organizations "immune from search," use such noncomparative language to define immunities in a static way. 22 U.S.C. § 288a(c). Or the statute could have specified that it was incorporating the law of foreign sovereign immunity as it existed on a particular date. See, e .g ., Energy Policy Act of 1992, 30 U.S.C. § 242(c)(1) (certain land patents "shall provide for surface use to the same extent as is provided under applicable law prior to October 24, 1992"). Because the IOIA does neither of those things, we think the "same as" formulation is best understood to make international organization immunity and foreign sovereign immunity continuously equivalent.
That reading finds support in other statutes that use similar or identical language to place two groups on equal footing. In the Civil Rights Act of 1866, for instance, Congress established a rule of equal treatment for newly freed slaves by giving them the "same right" to make and enforce contracts and to buy and sell property "as is enjoyed by white citizens." 42 U.S.C. §§ 1981(a), 1982. That provision is of course understood to guarantee continuous equality between white and nonwhite citizens with respect to the rights in question. See Jones v. Alfred H. Mayer Co. , 392 U.S. 409, 427-430, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Similarly, the Federal Tort Claims Act states that the "United States shall be liable" in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. That provision is most naturally understood to make the United States liable in the same way as a private individual at any given time. See Richards v. United States , 369 U.S. 1, 6-7, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Such "same as" provisions dot the statute books, and federal and state courts commonly read them to mandate ongoing equal treatment of two groups or objects. See, e .g ., Adamson v. Bowen , 855 F.2d 668, 671-672 (CA10 1988) (statute making United States liable for fees and expenses "to the same extent that any other party would be liable under the common law or under the terms of any statute" interpreted to continuously tie liability of United States to that of any other party); Kugler's Appeal , 55 Pa. 123, 124-125 (1867) (statute making the procedure for dividing election districts "the same as" the procedure for dividing townships interpreted to continuously tie the former procedure to the latter).
The IFC objects that the IOIA is different because the purpose of international organization immunity is entirely distinct from the purpose of foreign sovereign immunity. Foreign sovereign immunity, the IFC argues, is grounded in the mutual respect of sovereigns and serves the ends of international comity and reciprocity. The purpose of international organization immunity, on the other hand, is to allow such organizations to freely pursue the collective goals of member countries without undue interference from the courts of any one member country. The IFC therefore urges that the IOIA should not be read to tether international organization immunity to changing foreign sovereign immunity.
*769 But that gets the inquiry backward. We ordinarily assume, "absent a clearly expressed legislative intention to the contrary," that "the legislative purpose is expressed by the ordinary meaning of the words used." American Tobacco Co. v. Patterson , 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (alterations omitted). Whatever the ultimate purpose of international organization immunity may be-the IOIA does not address that question-the immediate purpose of the immunity provision is expressed in language that Congress typically uses to make one thing continuously equivalent to another.
B
The more natural reading of the IOIA is confirmed by a canon of statutory interpretation that was well established when the IOIA was drafted. According to the "reference" canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises. 2 J. Sutherland, Statutory Construction §§ 5207-5208 (3d ed. 1943). For example, a statute allowing a company to "collect the same tolls and enjoy the same privileges" as other companies incorporates the law governing tolls and privileges as it exists at any given moment. Snell v. Chicago , 133 Ill. 413, 437-439, 24 N.E. 532, 537 (1890). In contrast, a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments. See, e .g ., Culver v. People ex rel. Kochersperger , 161 Ill. 89, 95-99, 43 N.E. 812, 814-815 (1896) (tax-assessment statute referring to specific article of another statute does not adopt subsequent amendments to that article).
Federal courts have often relied on the reference canon, explicitly or implicitly, to harmonize a statute with an external body of law that the statute refers to generally. Thus, for instance, a statute that exempts from disclosure agency documents that "would not be available by law to a party ... in litigation with the agency" incorporates the general law governing attorney work-product privilege as it exists when the statute is applied. FTC v. Grolier Inc. , 462 U.S. 19, 20, 26-27, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (emphasis added); id ., at 34 n. 6, 103 S.Ct. 2209 (Brennan, J., concurring in part and concurring in judgment). Likewise, a general reference to federal discovery rules incorporates those rules "as they are found on any given day, today included," El Encanto, Inc. v. Hatch Chile Co. , 825 F.3d 1161, 1164 (CA10 2016), and a general reference to "the crime of piracy as defined by the law of nations" incorporates a definition of piracy "that changes with advancements in the law of nations," United States v. Dire , 680 F.3d 446, 451, 467-469 (CA4 2012).
The same logic applies here. The IOIA's reference to the immunity enjoyed by foreign governments is a general rather than specific reference. The reference is to an external body of potentially evolving law-the law of foreign sovereign immunity-not to a specific provision of another statute. The IOIA should therefore be understood to link the law of international organization immunity to the law of foreign sovereign immunity, so that the one develops in tandem with the other.
The IFC contends that the IOIA's reference to the immunity enjoyed by foreign governments is not a general reference to an external body of law, but is instead a specific reference to a common law concept that had a fixed meaning when the IOIA was enacted in 1945. And because we ordinarily presume that "Congress *770 intends to incorporate the well-settled meaning of the common-law terms it uses," Neder v. United States , 527 U.S. 1, 23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the IFC argues that we should read the IOIA to incorporate what the IFC maintains was the then-settled meaning of the "immunity enjoyed by foreign governments": virtually absolute immunity.
But in 1945, the "immunity enjoyed by foreign governments" did not mean "virtually absolute immunity." The phrase is not a term of art with substantive content, such as "fraud" or "forgery." See id ., at 22, 119 S.Ct. 1827 ; Gilbert v. United States , 370 U.S. 650, 655, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962). It is rather a concept that can be given scope and content only by reference to the rules governing foreign sovereign immunity. It is true that under the rules applicable in 1945, the extent of immunity from suit was virtually absolute, while under the rules applicable today, it is more limited. But in 1945, as today, the IOIA's instruction to grant international organizations the immunity "enjoyed by foreign governments" is an instruction to look up the applicable rules of foreign sovereign immunity, wherever those rules may be found-the common law, the law of nations, or a statute. In other words, it is a general reference to an external body of (potentially evolving) law.
C
In ruling for the IFC, the D. C. Circuit relied upon its prior decision in Atkinson , 156 F.3d 1335. Atkinson acknowledged the reference canon, but concluded that the canon's probative force was "outweighed" by a structural inference the court derived from the larger context of the IOIA. Id ., at 1341. The Atkinson court focused on the provision of the IOIA that gives the President the authority to withhold, withdraw, condition, or limit the otherwise applicable privileges and immunities of an international organization, "in the light of the functions performed by any such international organization." 22 U.S.C. § 288. The court understood that provision to "delegate to the President the responsibility for updating the immunities of international organizations in the face of changing circumstances." Atkinson , 156 F.3d at 1341. That delegation, the court reasoned, "undermine[d]" the view that Congress intended the IOIA to in effect update itself by incorporating changes in the law governing foreign sovereign immunity. Ibid .
We do not agree. The delegation provision is most naturally read to allow the President to modify, on a case-by-case basis, the immunity rules that would otherwise apply to a particular international organization. The statute authorizes the President to take action with respect to a single organization-"any such organization"-in light of the functions performed by "such organization." 28 U.S.C. § 288. The text suggests retail rather than wholesale action, and that is in fact how authority under § 288 has been exercised in the past. See, e .g ., Exec. Order No. 12425, 3 C.F.R. 193 (1984) ( designating INTERPOL as an international organization under the IOIA but withholding certain privileges and immunities); Exec. Order No. 11718, 3 C.F.R. 177 (1974) (same for INTELSAT). In any event, the fact that the President has power to modify otherwise applicable immunity rules is perfectly compatible with the notion that those rules might themselves change over time in light of developments in the law governing foreign sovereign immunity.
The D. C. Circuit in Atkinson also gave no consideration to the opinion of the State Department, whose views in this area ordinarily receive "special attention."
*771 Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l. Drilling Co ., 581 U.S. ----, ----, 137 S.Ct. 1312, 1320, 197 L.Ed.2d 663 (2017). Shortly after the FSIA was enacted, the State Department took the position that the immunity rules of the IOIA and the FSIA were now "link[ed]." Letter from Detlev F. Vagts, Office of the Legal Adviser, to Robert M. Carswell, Jr., Senior Legal Advisor, OAS, p. 2 (Mar. 24, 1977). The Department reaffirmed that view during subsequent administrations, and it has reaffirmed it again here.[2] That longstanding view further bolsters our understanding of the IOIA's immunity provision.
D
The IFC argues that interpreting the IOIA's immunity provision to grant anything less than absolute immunity would lead to a number of undesirable results.
The IFC first contends that affording international organizations only restrictive immunity would defeat the purpose of granting them immunity in the first place. Allowing international organizations to be sued in one member country's courts would in effect allow that member to second-guess the collective decisions of the others. It would also expose international organizations to money damages, which would in turn make it more difficult and expensive for them to fulfill their missions. The IFC argues that this problem is especially acute for international development banks. Because those banks use the tools of commerce to achieve their objectives, they may be subject to suit under the FSIA's commercial activity exception for most or all of their core activities, unlike foreign sovereigns. According to the IFC, allowing such suits would bring a flood of foreign-plaintiff litigation into U.S. courts, raising many of the same foreign-relations concerns that we identified when considering similar litigation under the Alien Tort Statute. See Jesner v. Arab Bank , PLC , 584 U.S. ----, ---- - ----, 138 S.Ct. 1386, 200 L.Ed.2d 612 (2018) ; Kiobel v. Royal Dutch Petroleum Co. , 569 U.S. 108, 116-117, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013).
The IFC's concerns are inflated. To begin, the privileges and immunities accorded by the IOIA are only default rules. If the work of a given international organization would be impaired by restrictive immunity, the organization's charter can always specify a different level of immunity. The charters of many international organizations do just that. See, e .g ., Convention on Privileges and Immunities of the United Nations, Art. II, § 2, Feb. 13, 1946, 21 U.S.T. 1422, T. I. A. S. No. 6900 ("The United Nations ... shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity"); Articles of Agreement of the International *772 Monetary Fund, Art. IX, § 3, Dec. 27, 1945, 60 Stat. 1413, T. I. A. S. No. 1501 (IMF enjoys "immunity from every form of judicial process except to the extent that it expressly waives its immunity"). Notably, the IFC's own charter does not state that the IFC is absolutely immune from suit.
Nor is there good reason to think that restrictive immunity would expose international development banks to excessive liability. As an initial matter, it is not clear that the lending activity of all development banks qualifies as commercial activity within the meaning of the FSIA. To be considered "commercial," an activity must be "the type " of activity "by which a private party engages in" trade or commerce. Republic of Argentina v. Weltover, Inc. , 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) ; see 28 U.S.C. § 1603(d). As the Government suggested at oral argument, the lending activity of at least some development banks, such as those that make conditional loans to governments, may not qualify as "commercial" under the FSIA. See Tr. of Oral Arg. 27-30.
And even if an international development bank's lending activity does qualify as commercial, that does not mean the organization is automatically subject to suit. The FSIA includes other requirements that must also be met. For one thing, the commercial activity must have a sufficient nexus to the United States. See 28 U.S.C. §§ 1603, 1605(a)(2). For another, a lawsuit must be "based upon" either the commercial activity itself or acts performed in connection with the commercial activity. See § 1605(a)(2). Thus, if the "gravamen" of a lawsuit is tortious activity abroad, the suit is not "based upon" commercial activity within the meaning of the FSIA's commercial activity exception. See OBB Personenverkehr AG v. Sachs , 577 U.S. ----, ---- - ----, 136 S.Ct. 390, 395-396, 193 L.Ed.2d 269 (2015) ; Saudi Arabia v. Nelson , 507 U.S. 349, 356-359, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). At oral argument in this case, the Government stated that it has "serious doubts" whether petitioners' suit, which largely concerns allegedly tortious conduct in India, would satisfy the "based upon" requirement. Tr. of Oral Arg. 25-26. In short, restrictive immunity hardly means unlimited exposure to suit for international organizations.
* * *
The International Organizations Immunities Act grants international organizations the "same immunity" from suit "as is enjoyed by foreign governments" at any given time. Today, that means that the Foreign Sovereign Immunities Act governs the immunity of international organizations. The International Finance Corporation is therefore not absolutely immune from suit.
The judgment of the United States Court of Appeals for the D. C. Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.
Justice KAVANAUGH took no part in the consideration or decision of this case.

The immunity was "virtually" absolute because it was subject to occasional exceptions for specific situations. In Republic of Mexico v. Hoffman , 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945), for example, the State Department declined to recommend, and the Court did not grant, immunity from suit with respect to a ship that Mexico owned but did not possess.

See Letter from Roberts B. Owen, Legal Adviser, to Leroy D. Clark, Gen. Counsel, EEOC (June 24, 1980) in Nash, Contemporary Practice of the United States Relating to International Law, 74 Am. J. Int'l. L. 917, 918 (1980) ("By virtue of the FSIA, and unless otherwise specified in their constitutive agreements, international organizations are now subject to the jurisdiction of our courts in respect of their commercial activities, while retaining immunity for their acts of a public character."); Letter from Arnold Kanter, Acting Secretary of State, to President George H. W. Bush (Sept. 12, 1992) in Digest of United States Practice in International Law 1016-1017 (S. Cummins & D. Stewart eds. 2005) (explaining that the Headquarters Agreement of the Organization of American States affords the OAS "full immunity from judicial process, thus going beyond the usual United States practice of affording restrictive immunity," in exchange for assurances that OAS would provide for "appropriate modes of settlement of those disputes for which jurisdiction would exist against a foreign government under the" FSIA); Brief for United States as Amicus Curiae 24-29.