21-1458-cv
*El Omari v. The International Criminal Police Organization*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2021

Argued: February 3, 2022     Decided: May 24, 2022

Docket No. 21-1458-cv

OUSSAMA EL OMARI,

*Plaintiff-Appellant,*

— v. —

THE INTERNATIONAL CRIMINAL POLICE ORGANIZATION, also known as INTERPOL,

*Defendant-Appellee.*[*]

B e f o r e :

CABRANES, LYNCH, and CHIN, *Circuit Judges.*

Oussama El Omari appeals from the dismissal, for lack of subject matter jurisdiction, of his civil action against the International Criminal Police Organization ("Interpol"), based on the district court's conclusion that Interpol is immune from suit under the International Organizations Immunities Act, 22 U.S.C. §§ 288-288*l*. El Omari argues that Interpol is not a "public international organization" within the meaning of § 288 and is thus ineligible for immunity under that Act, and, in the alternative, that Interpol has waived immunity for purposes of the present suit. We agree with the district

---

[*] The Clerk of Court is directed to amend the official caption in this case to conform with the caption above.

court that Interpol is immune from suit and has not waived its immunity. Accordingly, we AFFIRM the district court's order and judgment.

―――――――

SCOTT M. MOORE, Moore International Law PLLC, New York, NY, *for Plaintiff-Appellant*.

GINGER D. ANDERS (Jonathan S. Meltzer, *on the brief*), Munger, Tolles & Olson LLP, Washington, DC, *for Defendant-Appellee*.

―――――――

GERARD E. LYNCH, *Circuit Judge*:

Plaintiff-Appellant Oussama El Omari brought this action in the United States District Court for the Eastern District of New York against the International Criminal Police Organization, commonly known as "Interpol," charging negligent infliction of emotional distress and violation of his right to due process of law under the New York State Constitution, after Interpol refused to delete a so-called "red notice" identifying El Omari as a convicted criminal in the United Arab Emirates ("UAE"). The district court (Sterling Johnson, Jr., *J.*) granted Interpol's motion to dismiss for lack of subject matter jurisdiction, holding that Interpol is a protected organization under the International Organizations Immunities Act ("IOIA"), 22 U.S.C. §§ 288-288*l*, and thus enjoys the same immunity from suit normally enjoyed by foreign sovereigns. *See id*. § 288a(b). On appeal, El Omari argues that Interpol is not a "public international organization" within the meaning of § 288 and is thus not immune under the IOIA. Alternatively, El Omari argues that provisions in a 2008 agreement between Interpol and the Government of France (the

2

"Headquarters Agreement") acted as a waiver of any immunity Interpol possesses under the IOIA and thus permits jurisdiction over the present suit. He also argues that the district court erred in denying his request for jurisdictional discovery.

We conclude that Interpol qualifies as a "public international organization" within the meaning of § 288 and enjoys the same immunity from suit extended to foreign sovereigns. Furthermore, we agree with the district court that any arguable immunity waiver contained in the Headquarters Agreement is inapplicable to this action and that Interpol has not waived its immunity for the purposes of the present suit. We also conclude that the district court did not abuse its discretion by denying El Omari's request for jurisdictional discovery.

We therefore AFFIRM the order and judgment of the district court.

## BACKGROUND

**I.      Interpol and the Headquarters Agreement**

Interpol is an organization headquartered in Lyon, France. Although it is sometimes depicted in the popular culture as an operational law enforcement organization along the lines of the FBI, Interpol's primary function is simply to facilitate communications between the various domestic police agencies in its 194 participating countries. One way Interpol performs that function is by issuing color-coded notices at the request of participating countries. A red notice is, in effect, a notice that an identified person is wanted for prosecution or has been convicted by one of the participating

3

countries. Interpol's procedures for issuing and maintaining red notices is largely governed by Interpol's Constitution and its Rules for the Processing of Data. Any individual may challenge the accuracy of a red notice by instituting proceedings directly before the Commission for the Control of Interpol's Files ("CCF").[1]

In 2008, Interpol negotiated a Headquarters Agreement with the Government of France to "define, on the territory of the French Republic, the status, privileges and immunities of . . . [Interpol,] which are necessary for the exercise of its functions and the achievement of its aims." Joint App'x 153. That agreement entered into force on September 4, 2009. Under Article 24 of the agreement, "any dispute between [Interpol] and a private party shall be settled in accordance with the Optional Rules for Arbitration between International Organizations and Private Parties of the Permanent Court of Arbitration" by a tribunal of "members appointed by the Secretary General of the Permanent Court of Arbitration."[2] *Id.* at 160. On March 17, 2016, the Government of

---

[1] A record of "certain anonymized decisions" by CCF is available on Interpol's website. *See CCF Sessions and Decisions*, INTERPOL, https://www.interpol.int/en/Who-we-are/Commission-for-the-Control-of-INTERPOL-s-Files-CCF/CCF-sessions-and-decisions (last visited May 9, 2022). Among ten anonymized decisions from 2019 – the most recent year from which such decisions have been released – five challenges to Interpol notices resulted in data being successfully removed from Interpol files.

[2] The Permanent Court of Arbitration was created by the Convention for the Pacific Settlement of International Disputes, which was concluded at The Hague in 1899 during the first Hague Peace Conference, and revised at the second Hague Peace Conference in 1907. *See History*, PERMANENT COURT OF ARBITRATION, https://pca-cpa.org/en/about/introduction/history/ (last accessed May 9, 2022).

France promulgated Decree No. 2016-326 in the form of letters between Interpol and French government officials clarifying that the arbitration provision in Article 24 "does not apply . . . to disputes regarding the processing of data in Interpol's Information System – such as Interpol notices, diffusions or messages." *Id.* at 166. That decree seemingly clarified that the Headquarters Agreement does not enable private parties to force Interpol into arbitration over its handling of red notices.

## II.    El Omari's Interactions With Interpol

According to the complaint he filed in this case, Oussama El Omari is a United States citizen who lives in North Carolina. He previously worked in the UAE for a member of one of that country's ruling families, Sheikh Faisal bin Saqr Al Qassimi. El Omari asserts that his trouble began after Sheikh Faisal fell out with his brother, Sheikh Saud bin Saqr Al Qasimi, the ruler of Ras Al Khaimah, one of the UAE's seven Emirates. *See Zoarab v. Mukasey*, 524 F.3d 777, 778 (6th Cir. 2008). As a result of that fraternal dispute, El Omari and his co-workers were terminated from their positions and wrongfully prosecuted on a variety of spurious charges before secretive tribunals.

When El Omari returned to the United States on July 31, 2016, he was temporarily detained by U.S. Customs officers – causing him to miss his connecting flight – and informed that he was wanted in the UAE. El Omari later learned that Interpol had issued a red notice for him at the request of the UAE following his February 8, 2015, conviction *in absentia* for embezzlement and abuse of position by the Criminal Court of Ras Al Khaimah.

5

El Omari asked Interpol to remove or modify the red notice, arguing that he had been wrongfully convicted for political reasons.[3] Interpol declined to modify the red notice, concluding that El Omari had not established that the political elements of his case outweighed the ordinary criminal law elements, and that El Omari had the right to appeal the decision against him in the UAE with the assistance of counsel.

El Omari responded by bringing this action against Interpol, alleging that its refusal to remove or otherwise alter the red notice constituted negligent infliction of emotional distress and violated his due process rights under the New York State Constitution. The district court dismissed the case for lack of subject matter jurisdiction, concluding that Interpol was immune from suit under the IOIA, and had not waived that immunity. *See El Omari v. International Crim. Police Org. - Interpol*, No. 19-cv-1457, 2021 WL 1924183, at *4-7 (E.D.N.Y. May 13, 2021). This appeal followed.

**DISCUSSION**

"We review *de novo* a district court's dismissal of a claim for lack of

---

[3] More generally, the complaint alleges that the red notice system has been repeatedly abused by the UAE to attack political opponents and gain leverage in civil disputes. *See* Joint App'x at 16. Similar concerns about nations abusing Interpol's notice system appear in the news with some regularity. *See, e.g.*, Editorial Board, Opinion, *Hong Kong Exiles Fear an Interpol Red Notice*, WALL ST. J., Feb 11, 2022, at A16 ("Authoritarian governments have abused the [red notice] system in the past to hound opponents and limit their freedom of movement."); Matt Apuzzo, *How Repressive World Leaders Turned Interpol Into Their Personal Weapon,* N.Y. TIMES, Mar. 23, 2019, at A10.

subject-matter jurisdiction." *Brzak v. United Nations*, 597 F.3d 107, 110–11 (2d Cir.

2010), citing *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 241 (2d Cir. 2003). "We also

review *de novo* legal conclusions which grant or deny immunity." *Id.* at 111, citing

*Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009).

## I.      Interpol Is Immune from Suit Under the IOIA.

The IOIA, first enacted in 1945, provides that "[i]nternational organizations

. . . shall enjoy the same immunity from suit and every form of judicial process as is

enjoyed by foreign governments, except to the extent that such organizations may

expressly waive their immunity for the purpose of any proceedings or by the terms of any

contract." 22 U.S.C. § 288a(b). For the purposes of the IOIA "international organization"

is defined as:

> [1] a public international organization [2] in which the United
> States participates pursuant to any treaty or under the
> authority of any Act of Congress authorizing such
> participation or making an appropriation for such
> participation, and [3] which shall have been designated by the
> President through appropriate Executive order as being
> entitled to enjoy the privileges, exemptions, and immunities
> provided in this subchapter.

22 U.S.C. §288. The parties do not dispute that Interpol satisfies the second and third

criteria. Congress has provided statutory authorization for the United States to participate

in Interpol, 22 U.S.C. § 263a, and President Reagan issued an Executive Order

designating Interpol as an organization entitled to certain immunities and privileges under

7

the IOIA. *See* Exec. Order No. 12,425, 48 Fed. Reg. 28,069 (June 16, 1983) ("[T]he International Criminal Police Organization . . . is hereby designated as a public international organization entitled to enjoy the privileges, exemptions and immunities conferred by the International Organizations Immunities Act . . . ."). That designation was reaffirmed by Presidents Clinton and Obama when each expanded the scope of the IOIA immunities and privileges to which Interpol was entitled. *See* Exec. Order No. 12,971, 60 Fed. Reg. 48,617 (Sep. 15, 1995); Exec. Order No. 13,524, 74 Fed. Reg. 67,803 (Dec. 16, 2009).

The parties disagree, however, about whether Interpol is a "public international organization" within the meaning of § 288, and is thus eligible to receive the privileges, exemptions, and immunities conferred by the IOIA. Accordingly, the first issue we must address is whether Interpol qualifies as a "public international organization" under § 288.

A.      Public International Organizations Under the IOIA

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (internal quotations omitted). To determine that ordinary meaning, courts may look to contemporary dictionary definitions. *See id.* at 176. If the text of the statute "is not entirely clear, we then turn to the broader statutory context and its history." *Khalid v. Sessions*, 904 F.3d 129, 132 (2d Cir. 2018).

Starting with the text, the district court found that the term "public" ordinarily means "of or provided by the state rather than an independent, commercial company." *El Omari,* 2021 WL 1924183, at \*5. That is generally consistent with dictionary definitions that existed at the time the IOIA was adopted. *See, e.g.*, *Public*, THE OXFORD ENGLISH DICTIONARY (1933) ("Of or pertaining to the people as a whole; that belongs to, affects, or concerns the community or nation"). The term "public" was also defined as being the antithesis of "private." *See, e.g.*, *Public*, THE OXFORD ENGLISH DICTIONARY (1933) ("In general, and in most of the senses, the opposite of Private."). During the same time period, "international" was defined as concerning relations between nations, and "organization" referred to a coordinated entity. *See, e.g.*, *International*, THE OXFORD ENGLISH DICTIONARY (1933) ("Existing, constituted, or carried on between different nations; pertaining to the relations between nations."); *Organization*, THE OXFORD ENGLISH DICTIONARY (1933) ("An organized structure, body, or being . . . ."). Those definitions suggest that a "public international organization" must be a coordinated product of states and governments acting to serve their public interest. Interpol thus meets the straightforward dictionary definition of a public international organization.

To the extent there is any ambiguity about the meaning of a "public international organization" under the IOIA, the legislative history confirms that a public international organization includes any organization whose membership is composed of governments. As explained in the House Report for the IOIA:

> The term "international organization" as used in the bill and generally in this report is specifically limited to public international organizations, i. e., *those which are composed of governments as members*—and of these, to those of which the United States is a member and which shall have been designated by the President by Executive order as being entitled to enjoy the benefits of the bill.

H.R. REP. NO. 79-1203, at 1 (1945) ("House Report") (emphasis added). In other words, the House Report explicitly defined "public international organizations" in the context of the IOIA as organizations "which are composed of governments as members." *Id.* That definition is consistent with the ordinary meaning of the language and removes any ambiguity about the proper interpretation of the statutory text. *Id*.

That understanding is further confirmed by its adoption by the executive branch. The first executive order designating Interpol as entitled to IOIA protections was issued after President Reagan sought and obtained legal advice from the Department of Justice's Office of Legal Counsel ("OLC"). OLC responded to President Reagan with a January 1983 memorandum concluding that Interpol qualified as a "public international organization" because it is "composed of governments as members." Joint App'x 566-68, quoting House Report. OLC's 1983 conclusion tracked the requirements contained in the State Department's 1946 guidance for applicants seeking designation under the IOIA. *See* 14 State Department Bulletin No. 348, at 348-49 (Mar. 3, 1946). The decision by the State Department and, in turn, OLC to adopt the definition from the House Report, and

10

the decisions by successive Presidents to rely on that analysis, are entitled to considerable persuasive weight. *See Gonzales v. Oregon*, 546 U.S. 243, 268-69 (2006) (noting that the persuasiveness of the Executive Branch's interpretation of statutes outside of the rulemaking context depends, *inter alia*, on "the thoroughness evident in its consideration" and "its consistency with earlier and later pronouncements").

On appeal, El Omari proposes several alternative criteria that he argues should be required to qualify an entity as a "public international organization" within the meaning of the IOIA. First, he argues that Interpol is not "public" because it is not a government actor. Second, he argues that "public" is a term of art within United States tax law, and thus Interpol cannot be "public" because it would not qualify as tax exempt public charity under 26 U.S.C. § 501(c)(3), as evidenced by the fact that it accepts donations though its affiliate the Interpol Foundation rather than receiving donations directly. Finally, he points to dicta in *Jam v. International Finance Corp.* identifying examples of public international organizations entitled to IOIA immunity, "includ[ing] the United Nations, the International Monetary Fund, and the World Bank," and asks us to infer from those examples that IOIA protections may be extended only to organizations formed by international treaty.[4] 139 S.Ct. 759, 765 (2019). All of those arguments are unavailing.

---

[4] El Omari also argues that the decision in *Steinberg v. International Crim. Police Org.*, 672 F.2d 927 (D.C. Cir. 1981), which found that Interpol was subject to the personal jurisdiction of that court, demonstrates that Interpol is not entitled to IOIA immunity. Steinberg was decided in 1981, before President Reagan signed the first

There is no persuasive basis, textual or otherwise, for limiting a "public international organization" under § 288 to entities that are part of a single government. Similarly, there is no basis for construing the term "public" as incorporating portions of the United States Tax Code. The portion of the code defining tax-exempt organizations, which by its terms applies only for domestic tax purposes, *see* 26 U.S.C. §§ 501(a), (c), has no conceivable relevance to questions of international organization immunity. Indeed, the exemplary organizations identified by the Supreme Court in *Jam* – which El Omari concedes are proper examples of organizations entitled to IOIA immunity – would fail to satisfy those proposed criteria.[5]

---

executive order granting Interpol immunity under the IOIA, and thus at a time when Interpol lacked immunity under the IOIA because it had not yet been "designated by the President through appropriate Executive order" to enjoy such immunity, 22 U.S.C. § 288. That decision, which did not discuss whether Interpol qualifies as a "public international organization" under the IOIA, has no bearing on whether a court may exercise jurisdiction over Interpol today, in view of the intervening executive orders.

[5] The United Nations, for example, is neither a government actor nor a public charity. Rather, it is a forum for nations to conduct intergovernmental business. Similar to Interpol, the United Nations does not directly receive donations, but solicits funds through a variety of affiliated groups. *See, e.g.*, *How to Donate to the United Nations System*, UNITED NATIONS, https://www.un.org/en/about-us/how-to-donate-to-the-un-system (last visited May 16, 2022) (inviting donations to affiliated organizations such as the UN Human Rights Office, the UN Central Emergency Response Fund, the UN World Food Programme, the United Nations Children's Fund, and the UNESCO World Heritage Center). For similar reasons, we reject El Omari's passing argument that public international organizations must be restricted to agencies or instrumentalities of foreign governments based on the definition of "foreign state" under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-03. *See* Appellant's Br. 14-15.

We also disagree that *Jam* limits "public international organizations" to bodies that have been formed through international treaties. In *Jam*, the Supreme Court held that the IOIA "grants international organizations the same immunity from suit as is enjoyed by foreign governments at any given time." 139 S.Ct. at 772 (internal quotations omitted). As part of its discussion, the Supreme Court identified the United Nations, the International Monetary Fund, the World Bank, and the World Health Organization as examples of organizations entitled to immunity under the IOIA, and noted that the scope of that immunity can be curtailed by either the terms of the organization's founding charter or by the President acting pursuant to the authority delegated by the IOIA to withhold or withdraw the immunity of otherwise qualified public international organizations. *See id.* at 764-765. The *Jam* opinion did not address the proper interpretation of "public international organizations" under § 288, nor did it explain what specific characteristics of the listed organizations qualified them for that designation. It would not be appropriate for us to divine some limiting principle for what qualifies as "public" based solely on the organizations mentioned in the *Jam* opinion as examples of that category. And while *Jam* states that an organization's charter may in some cases override the IOIA's default rules regarding immunity, *id.* at 771, it did not suggest that all "public international organizations" must be formed pursuant to such a charter.

Moreover, the text of the IOIA itself refutes El Omari's contention that a "public organization" must be one created by treaty. "It is a cardinal principle of statutory

13

construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal citations and quotations omitted). The IOIA explicitly extends its protections to otherwise eligible organizations "in which the United States participates pursuant to any treaty *or under the authority of any Act of Congress* authorizing such participation." 22 U.S.C. § 288 (emphasis added). The use of the word "or" suggests that IOIA protections may extend to organizations where United States participation is authorized by statute, rather than by a treaty.[6]

Accordingly, based on the statutory language, the broader statutory context, the legislative history, and the consistent practice of the Executive Branch, we conclude that a "public international organization" as used in § 288 includes, at minimum, any international organization that is composed of governments as its members, regardless of whether it has been formed by international treaty.

B.      Interpol Qualifies as a Public International Organization.

We next turn to whether Interpol is properly categorized as a "public international organization" under that definition, and is thus eligible for designation by the President to receive the privileges and immunities conferred by the IOIA. El Omari's complaint

---

[6] For example, President George W. Bush designated the ITER International Fusion Energy Organization as protected under the IOIA, *see* Exec. Order No. 13,451, 72 Fed. Reg. 65,653 (Nov. 19, 2007), in which the United States participates pursuant to a statute, *see* 42 U.S.C. § 16312(c).

alleged that Interpol is composed of "member countries." Joint App'x 9. Interpol seemingly agrees with that characterization, describing itself throughout its brief as being composed of "member countries." *See, e.g.*, Appellee's Br. 1. More technically, however, Article 4 of Interpol's Constitution specifies that membership in Interpol is conferred on government agencies rather than on the nations they represent. Article 4 provides that participating countries "may delegate as a Member to the Organization *any official police body* whose functions come within the framework of activities of the Organization." Joint App'x 93 (emphasis added). Therefore, membership in Interpol formally belongs to the delegated "official police body" of each participating country.[7]

Interpol's extending membership to police organizations, combined with the fact that Interpol was not formed by international treaty, has led some to question whether Interpol is truly an international organization.[8] But to qualify as a "public international

---

[7] For example, the United States participates in Interpol through a dedicated agency within the Department of Justice, the Interpol-U.S. National Central Bureau ("USNCB"). *See* 28 C.F.R. § 0.34. It is thus presumably the USNCB, rather than the United States itself, that is formally an Interpol member.

[8] The proper classification of Interpol has been a topic of debate among international law scholars, with some arguing that it is a non-governmental organization that cannot technically qualify as an international organization as that term is used in international law, and others arguing that it has long-since achieved the status of a de facto intergovernmental organization whose membership is composed of central government organs. *Compare*, Andreas Gallas, Interpol, *in* 5 ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW 187, 187 (Rudolf Bernhardt ed., 1983) (arguing that Interpol is not an international organization) *with* Sabine Gless, Interpol, *in* 6 THE MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW 252, 255 (Rüdinger Wolfrum ed., 2012) (arguing that Interpol is such an organization). *See also* Giulio Calcara, A Transnational

15

organization" under the IOIA, it is sufficient that membership in Interpol is restricted to official government actors whose involvement is controlled by the particular participating nations. The political branches may authorize a government-controlled agency to represent the interests of the United States within an organization. In the case of Interpol, Congress explicitly authorized the Attorney General "to accept and maintain, on behalf of the United States, membership in the International Criminal Police Organization, and to designate any departments and agencies which may participate in the United States representation with that organization." 22 U.S.C. § 263a. That the United States acts through a specific government agency does not alter the fact that it is still the United States, subject to Congressional authorization and Executive control, that participates in Interpol. Similarly, the "official police bod[ies]" designated by the other participating nations are, for all relevant purposes, agents of their respective nations. CONSTITUTION OF THE INTERNATIONAL CRIMINAL POLICE ORGANIZATION-INTERPOL, Art. 4 (2021), Joint App'x 93; *see also id.* Art. 45, Joint App'x at 98 (indicating that the official police bodies

---

Police Network Co-operating Up to the Limits of the Law: Examination of the Origin of Interpol, 11 TRANSNATIONAL LEGAL THEORY 521, 536-37 (2020) (summarizing the majority view that Interpol is a de facto intergovernmental organization but noting that *"*a minority of scholars, until very recently, still claimed that [Interpol] is an NGO"). There is no indication that this academic debate, which post-dates the IOIA by at least several decades, was part of the contemporary "ordinary meaning," *Gross*, 557 U.S. at 175, when Congress in 1945 authorized immunity for "public international organization[s]" that meet the statutory criteria. We thus have no need to arbitrate between the competing academic theories.

"represent[]" the countries to which Interpol's Constitution applies). Because Interpol is functionally restricted to governments as members, acting through their chosen delegates, we conclude that it qualifies as a "public international organization" within the meaning of § 288.

## II.    Interpol Has Not Waived Its Immunity.

The IOIA provides immunity to public international organizations designated by the President "except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b). Like sovereign states, therefore, such organizations may waive the immunity provided to them by statute. El Omari argues that, even if Interpol is protected from suit by the IOIA, it effectively waived that protection by entering into the Headquarters Agreement with the Government of France in 2008. We disagree.

At the outset, we note that the Headquarters Agreement is a contract between Interpol and the Government of France that by its express terms is designed to define the "status, privileges and immunities" afforded to Interpol "*on the territory of the French Republic*." Headquarters Agreement, Preamble, Joint App'x 153 (emphasis added). There is no indication that either Interpol or the Government of France had any thought, in agreeing upon the terms on which Interpol would be subject to disputes arising from its day-to-day business on French soil, as to the rights, under New York law, of American citizens affected by Interpol's dissemination of information in the United States about criminal cases pending in the UAE.

17

Moreover, even if we were to make the extraordinary assumption that the dispute resolution provisions of the Headquarters Agreement had some application to this case, those provisions do not waive any immunity Interpol might have from suit in the courts of France, let alone of the United States. Article 24 of the Headquarters Agreement, which El Omari points to as a possible immunity waiver, provides a right to settle disputes "in accordance with the Optional Rules for Arbitration between International Organizations and Private Parties of the Permanent Court of Arbitration by a tribunal composed either of one or of three members appointed by the Secretary General of the Permanent Court of Arbitration." Joint App'x 160. At most, that provision creates only a right to arbitration. By comparison, other portions of the Headquarters Agreement suggest, if anything, that Interpol is immune to most civil suits within the French legal system. *See, e.g.*, Headquarters Agreement Art. 5, Joint App'x 154 (Interpol "shall enjoy immunity from legal process" except in certain enumerated cases). On no reasonable reading can the Headquarters Agreement be understood as an explicit waiver of the immunity from suit in American courts conferred by the IOIA.

Nor can we accept El Omari's argument that the Headquarters Agreement should be understood as an implicit immunity waiver. In the context of sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11, some courts have found "an implicit waiver . . . involving contracts in which a foreign state has agreed to arbitrate disputes without specifying jurisdiction in a particular country or

18

forum, or where another nation has stipulated that American law should govern any contractual disputes." *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985) (internal citations omitted). *But cf. Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) ("[A]n agreement to arbitrate in a foreign country, without more, ought not to operate as a waiver of sovereign immunity in United States courts, especially in favor of a non-party to the agreement." ). El Omari urges that, in view of *Jam*, similar restrictions would apply to international organizations under the IOIA. *See* 139 S. Ct. at 769 ("The IOIA . . . link[s] the law of international organization immunity to the law of foreign sovereign immunity, so that the one develops in tandem with the other."). But even assuming that similar standards apply in the FSIA and IOIA contexts, the Headquarters Agreement would not function as an implicit immunity waiver. Unlike the contracts discussed in *Frolova* as potentially creating such a waiver, the Headquarters Agreement specifies a particular forum for the arbitration, and a specialized set of rules to govern the arbitration that differ from general American law. *See* 761 F.2d at 377. If anything, the Headquarters Agreement is more akin to the sorts of agreements to arbitrate in foreign countries that, without more, do not generally act as immunity waivers to permit suit in federal district court. *See Cargill*, 991 F.2d at 1017.

For those reasons, even assuming that the right to arbitration in the Headquarters Agreement applied to the present suit, that right to arbitration would not act as either an explicit or implicit immunity wavier permitting El Omari to bring the present suit against Interpol in a federal district court.

19

Finally, we note that, before the present dispute between El Omari and Interpol arose, the French government promulgated Decree No. 2016-326, expressly accepting Interpol's understanding that the arbitration provision in Article 24 "does not apply . . . to disputes regarding the processing of data in Interpol's Information System – such as Interpol notices, diffusions or messages." Joint App'x 166. Thus, the parties to the Headquarters Agreement themselves – the Government of France and Interpol acting through its Secretary General – have made clear that the provisions on which El Omari relies for his contention that Interpol has waived immunity do not permit private parties to force Interpol into arbitration, still less into any court, over its handling of red notices. Therefore, even if the Headquarters Agreement would have somehow acted as an immunity waiver in the past, any such hypothetical waiver does not apply to El Omari's present suit.

For all of the above reasons, El Omari's argument that Interpol has waived the protections of the IOIA is without merit.

### III. Jurisdictional Discovery

Finally, El Omari argues that the district court erred by denying him leave to conduct jurisdictional discovery prior to dismissal. Specifically, El Omari sought a variety of documents intended to show that "on the date El Omari was detained at JFK, . . . Interpol had no legal status under the laws of France other than [as] a commonplace non-profit entity, and [to] support a finding that Interpol is not 'public' and not immune

20

from suit." Appellant's Br. 20. The district court tacitly denied El Omari's request by granting Interpol's motion to dismiss for want of subject matter jurisdiction. *See El Omari,* 2021 WL 1924183, at *4.

"We review a district court's denial of jurisdictional discovery for abuse of discretion, always mindful that a district court has wide latitude to determine the scope of discovery." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (internal citations and quotations omitted). "When sovereign immunity is at issue, discovery is warranted 'only to verify allegations of specific facts crucial to an immunity determination.'" *Id.* at 207, citing *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007). A similar standard applies to immunity under the IOIA because it "develops in tandem" with the law of foreign sovereign immunity. *Jam*, 139 S. Ct. at 769.

In the present case, the information sought by El Omari has no bearing on the immunity determination. Interpol's non-profit status under the laws of France sheds no light on whether Interpol qualifies as a "public international organization" entitled to the protections conferred by the IOIA. 22 U.S.C. § 288. Rather, as explained above, the relevant inquiry is whether the organization is effectively composed of governments as members, whether Congress has authorized the United States to participate in the organization, and whether the President has chosen to extend protections to the organization through an executive order. *See id.* Because the requested discovery was not

21

germane to the immunity determination, it was not an abuse of discretion for the district court to deny the request for jurisdictional discovery. *See Arch Trading*, 839 F.3d at 207.

## CONCLUSION

To summarize, we conclude that:

1. The term "public international organizations" as used in 22 U.S.C. § 288 includes any international organization that is composed of governments as its members, regardless of whether it has been formed by international treaty.

2. Interpol qualifies as a "public international organization" for the purposes of 22 U.S.C. § 288 because its members are official government actors whose involvement is subject to control by participating nations.

3. The Headquarters Agreement between Interpol and the Government of France does not constitute an immunity waiver that would permit the present suit in a United States district court.

4. The district court did not abuse its discretion by denying El Omari's request for jurisdictional discovery prior to dismissal.

Accordingly, the judgment of the district court is **AFFIRMED**.