In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-2734

ARUN KUMAR BHATTACHARYA,

*Plaintiff-Appellant,*

*v.*

STATE BANK OF INDIA,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-3361 — **Andrea R. Wood**, *Judge.*

———————————

SUBMITTED MAY 12, 2023[*] — DECIDED JUNE 12, 2023

———————————

Before BRENNAN, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge*. Arun Bhattacharya, a U.S. citizen
and Illinois resident of Indian origin, opened a non-resident
account with State Bank of India through one of its India-

———————————

[*] We have agreed to decide this case without oral argument because
the brief and record adequately present the facts and legal arguments, and
oral argument would not significantly aid the court. See FED. R. APP.
P. 34(a)(2)(C).

based branches. When State Bank of India retroactively changed the terms of the account, Bhattacharya sued for breach of contract. The district court dismissed his complaint for lack of subject matter jurisdiction, concluding that the Foreign Sovereign Immunities Act applied to Bhattacharya's claim and immunized the Bank from suit. We agree and affirm.

## I

### A

The doctrine of foreign sovereign immunity developed at common law as "a matter of grace and comity on the part of the United States." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). In support of these principles, federal courts traditionally "deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486. For the first 150 years of our nation's history, this meant that foreign states generally held absolute immunity from suit in U.S. courts. See *id.*

That changed in 1952. It was then that the State Department responded to foreign governments' increasing engagement in commercial activity by adopting a new, restrictive theory of foreign sovereign immunity. See *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 766 (2019) (citing Letter from Jack B. Tate, Acting Legal Adviser, Dep't of State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952), *reprinted in* 26 Dep't State Bull. 984–85 (1952)). This new approach would confer

immunity on foreign governments "only with respect to their sovereign acts, not with respect to commercial acts." *Id.*

In 1976 Congress codified this more restrictive theory of foreign sovereign immunity in the Foreign Sovereign Immunities Act. Pub. L. No. 94-583, 90 Stat. 2891 (codified at 28 U.S.C. §§ 1330, 1602–1611); see also *Verlinden*, 416 U.S. at 488. The FSIA "transferred 'primary responsibility for immunity determinations from the Executive to the Judicial Branch.'" *Jam*, 139 S. Ct. at 766 (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004)).

To aid courts in their new role, the Act provides "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Verlinden*, 461 U.S. at 488. This includes a presumption that foreign sovereigns and their instrumentalities are immune from suit in U.S. courts. See 28 U.S.C. § 1604; see also *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 946 (2023). The only exceptions to this general grant of foreign sovereign immunity are codified in the Act itself. See *Rubin*, 138 S. Ct. at 822 (explaining that the FSIA provides "certain express exceptions" to foreign sovereign immunity).

## B

Bhattacharya's appeal concerns an exception for foreign sovereigns engaged in commercial activity. The FSIA does not grant foreign sovereigns or their instrumentalities immunity when

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United

> States in connection with a commercial activity
> of the foreign state elsewhere; or upon an act
> outside the territory of the United States in con-
> nection with a commercial activity of the foreign
> state elsewhere and that act causes a direct ef-
> fect in the United States.

28 U.S.C. § 1605(a)(2).

Before diving into the various substantive components of the commercial activity exception, it is important to pause on the meaning of one of its key terms. The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act" and further provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has interpreted this to mean that a foreign sovereign's actions are commercial for purposes of this exception when it acts "not as regulator of a market, but in the manner of a private player within it." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

Now for the substance of the commercial activity exception. By its terms, the exception applies—and federal courts retain jurisdiction—in three kinds of situations: (1) if a lawsuit is based on commercial activity carried on in the United States; (2) if it is based on an act performed in the United States in connection with commercial activity elsewhere; or (3) if it is based on an act outside the territory of the United States in connection with commercial activity elsewhere and the act caused a direct effect in the United States. See 28 U.S.C. § 1605(a)(2).

If we focus on the third situation where the exception applies, we find three elements that must be established. There must be an extraterritorial act, a connection to extraterritorial commercial activity, and a direct effect in the United States. See *Weltover*, 504 U.S. at 611.

This case involves this third situation, and more specifically the third element—the presence of a direct effect in the United States. In its 1992 *Weltover* decision, the Supreme Court provided a starting point for understanding what the term "direct effect" means. The Court determined that Argentina's unilateral rescheduling of bond payments had a direct effect in the United States because the plaintiffs had designated New York bank accounts as the place for payment, so New York was "the place of performance for Argentina's ultimate contractual obligations." *Id.* at 619. *Weltover* thus stands for the proposition that a sovereign's actions affecting accounts held in the United States qualify as acts in connection with commercial activity that have a direct effect for purposes of the FSIA.

Other circuits, relying on *Weltover*, have found that the existence or absence of a designated place of payment in the United States is often decisive in the direct effect analysis. See, *e.g.*, *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108–09 (2d Cir. 2016) ("Based on *Weltover*'s holding, courts have consistently held that, in contract cases, a breach of a contractual duty causes a direct effect … so long as the United States is the place of performance for the breached duty."); *R&R Int'l Consulting LLC v. Banco do Brasil, S.A.*, 981 F.3d 1239, 1244 (11th Cir. 2020) (finding a direct effect where the affected bonds—by their terms—could be redeemed for payment in a bank's Miami branch); *Valambhia v.*

*United Republic of Tanzania*, 964 F.3d 1135, 1142 (D.C. Cir. 2020) (finding no direct effect where the parties "had no arrangement that called for Tanzania's use of a [U.S.] bank account or invited the Valambhias to demand payment within the United States").

Though we have not yet had occasion to weigh in on this issue, we think the approach taken by our fellow circuits is sound. We therefore conclude that—at least in a dispute that, like this one, involves straightforward allegations of breach of contract—a plaintiff wishing to invoke the commercial activity exception by pointing to a direct effect in the United States must be able to identify language in the agreement that designates the United States as a site for performance on the contract.

## II

With this legal framework in place, we review Bhattacharya's claim against State Bank of India.

## A

State Bank of India operates branches in India and all over the world, including three in the United States. Among other options available to its clients, State Bank of India offers non-resident accounts to senior citizens of Indian origin living outside India. These accounts are offered only through the Bank's India-based branches; they do not have any connection with the Bank's overseas branches. State Bank of India does, however, conduct individual and commercial banking activity through its overseas branches, including those in the United States.

In 2012, and while living in Chicago, Bhattacharya opened a non-resident account with State Bank of India. He deposited

his retirement pension into the account and purchased certif-icates of deposit that promised to earn a fixed rate of interest, plus an additional 1.5% that rolled over into new certificates of deposit when the original certificates reached maturity. But in 2020 State Bank of India informed Bhattacharya that the Re-serve Bank of India (India's central bank) had eliminated the increased 1.5% interest earnings for any accounts held by non-resident Indian senior citizens. This rate reduction had appar-ently gone into effect in 2012, so State Bank of India told Bhattacharya that it would retroactively debit his account for the extra 1.5% interest payments he had been receiving for the eight years he had his account.

Bhattacharya objected and, in the course of challenging the Bank's actions, learned more upsetting news. He found out that in 2017 State Bank of India began applying a variable interest rate—rather than the fixed interest rate he was prom-ised in 2012—to his certificates of deposit. So he understand-ably complained and demanded copies of all interest records for his account dating back to 2017. State Bank of India re-fused his request and, according to Bhattacharya, retaliated against him for his complaints by freezing his account, liqui-dating his certificates of deposit, and transferring his funds into a locked, non-interest-bearing account.

Bhattacharya sued State Bank of India for breach of con-tract in federal court in Illinois. Later he amended his com-plaint to add a demand for an accounting of all interest, as well as a claim that the Bank violated American consumer-protection laws. State Bank of India moved to dismiss the complaint, asserting that the FSIA stripped the district court of jurisdiction over the case. Bhattacharya acknowledged the Bank's status as an instrumentality of a foreign sovereign but

argued that his claims fell within the FSIA's commercial activity exception. He contended that State Bank of India's activities—including its operation of U.S. branches, its marketing efforts to U.S. citizens, and its actions taken with respect to his non-resident account—directly affected him in the United States and therefore fit within the FSIA's commercial activity exception.

B

In a careful and thorough opinion, the district court concluded that the commercial activity exception did not apply, so it held that it lacked jurisdiction over Bhattacharya's claims against State Bank of India. At the outset, the district court agreed with both parties and found that the FSIA applies to State Bank of India because the Indian government is the Bank's majority shareholder. See 28 U.S.C. § 1603(a), (b)(2); *Turkiye Halk Bankasi*, 143 S. Ct. at 946–47.

The district court went on to find that Bhattacharya's suit was not based upon commercial activity carried on in the United States. It explained that Bhattacharya never held an account with one of the Bank's U.S. branches, and the contested actions—the withdrawals and interest rate changes—resulted from regulatory actions taken by India's central bank. Bhattacharya may have suffered financial loss in his account, the court recognized, but financial injury to a U.S. citizen is insufficient unless the foreign state performed some "legally significant act" in the United States—a showing that Bhattacharya had not made. See *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 581–82 (7th Cir. 1989).

**III**

On appeal Bhattacharya contends that the district court misapplied the direct effect provision of the commercial activity exception. He maintains that State Bank of India's actions had a direct effect in the United States as evidenced by its operation of U.S.-based branches, the advertisement of its accounts to U.S. citizens, and the "enormous loss and mental agony" it has caused him. Bhattacharya highlights the Bank's solicitation practices inviting U.S. citizens to open non-resident accounts as a direct effect of its commercial activity.

The district court was correct to conclude that these activities—without more—are insufficient to establish a direct effect in the United States. Bhattacharya's non-resident account is maintained in India, and the relevant transactions were with the Bank's India-based branches. Bhattacharya did not allege that his suit related to any account held with a U.S.-based branch of the Bank or was otherwise related to any actions the Bank had taken here. Nor did he point to any agreement with State Bank of India that established the United States as the site of performance. To the contrary, Bhattacharya's contract agreement established his account with Indian branches of the Bank.

Because the district court got the analysis exactly right, we AFFIRM.