LUTCHER S. A. CELULOSE e PAPEL
and F. Lutcher Brown, Appellants,

v.

INTER-AMERICAN DEVELOPMENT
BANK, Appellee.

No. 20166.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 18, 1967.

Decided July 13, 1967.

William W. Rayner, Washington, D. C., and Ernest A. Gross, New York City, for appellants.

William D. Rogers, Washington, D. C., for appellee.

Before EDGERTON, Senior Circuit Judge, FAHY* and BURGER, Circuit Judges.

BURGER, Circuit Judge:

Appellants brought suit in the District Court for damages and injunctive relief claiming that the Bank had violated loan agreements with Lutcher S.A. Celulose e Papel by participating in loans made to competitors of Lutcher. This appeal followed the District Court's denial of preliminary injunctive relief and the grant of the Bank's motion to dismiss on the ground that the Bank is immune from suit and that the complaint failed to state a claim for which relief could be granted.[1]

Appellant Lutcher S.A. is a Brazilian corporation organized in 1959 to engage in lumbering operations and the processing of paper pulp; F. Lutcher Brown is president and majority shareholder of Lutcher S.A.

Appellee is an international lending institution established in 1959 by joint action and subscription of the United States of America and all Latin American nations, Cuba excepted. Its stated purpose is "to contribute to the acceleration of the process of economic development of the member countries" by, among other means, "financing the developmnt of member countries, giving priority to those loans and guarantees that will contribute most effectively to their economic growth."[2]

The complaint alleges that from 1961 to 1964 the Bank made loans to Lutcher aggregating $8,700,000. In the same period it also made loans aggregating $5,000,000 to another Brazilian corporation engaged in lumbering and pulp processing, Papel e Celulose Catarinense Ltda., referred to as the Klabin group. Klabin operated the largest pulp and paper facility in Brazil and had a "monopoly in the newsprint industry." The Bank also made loans of $15,500,000 to another borrower to expand the largest pulp and paper and newsprint facility in Chile. These loans were made over Brown's protests that the Bank had inaccurate information about the state of the pulp market in Brazil and in Latin America and that these loans could jeop-

---

\* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

I. Appellants also appeal from the District Court's statement that the competitor was an indispensable party; our disposition of the case renders this question moot. Cf. Lumberman's Mut. Casu-

alty Co. v. Elbert, 348 U.S. 48, 51–52, 75 S.Ct. 151, 99 L.Ed. 59 (1954).

2. Articles of Agreement Establishing the Inter-American Development Bank, April 8, 1959, Art. I, §§ 1, 2(a) (ii), 10 U.S.T. & O.I.A. 3029, T.I.A.S. No. 4397.

ardize Lutcher's financial and competitive position.

In 1965 the Klabin group came to the Bank to obtain clearances to enable it to borrow additional funds from other sources, and Lutcher again urged the Bank to study the market situation. The Bank stated it would have an independent study made. In reliance on this, Appellants' complaint continues, Lutcher made payments owed the Bank. But in February, 1966, it is claimed, the Bank decided not to have a market study made. It appearing that the Bank was about to approve the Klabin request, Appellants brought this action to enjoin the Bank from doing so and to recover damages.

Appellants allege that the Bank "knowingly carried out wrongful acts with reckless disregard" for Appellants by lending to competitors and breached "an implied obligation" not to hinder Lutcher in fulfilling its contract with the Bank. The complaint alleges the Bank "impliedly warranted" to act "prudently" in considering loan applications from applicants in competition with Lutcher. Appellants view the duty of the Bank in these terms: "As a Development bank, the Inter-American Bank should have assisted Lutcher S.A. and by all means avoided any direct action detrimental to Lutcher S.A." They also claim that the Bank breached the 1965 agreements to make a market study, in reliance upon which Lutcher had incurred new debts and taken actions which it might otherwise not have taken.

Appellee contends, apart from argument on the merits, that it is immune from suit by virtue of specific legislation.[3] The International Organizations Immunities Act provides that international organizations may be designated by the President so that they "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract."[4] In 1960 President Eisenhower designated the Bank an international organization entitled to immunity,[5] hence the question of the Bank's immunity turns on whether it has waived immunity from suit.

The answer in this case must be found in the Agreement establishing the Bank. The relevant provision is paragraph 1, Section 3 of Article XI; it provides:

> Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.

This provision is hardly a model of clarity; Appellants argue it constitutes a waiver of immunity. The Bank urges that such an interpretation "would wipe out Section 2(b) of the Immunities Act," a result which it says can be avoided by interpreting the provision as only a partial waiver, allowing suit by bondholders, creditors, and beneficiaries of its guarantees, on the theory that in such cases vulnerability to suit contributes to the effectiveness of the Bank's operation.

Unless this provision is read as merely describing the available forum for such suits and actions as to which

---

3. Immunity can arise from the common law doctrine of sovereign immunity in some circumstances and from specific legislation. Congressional belief, well founded or not, that United States law did not provide immunity for international organizations was a motivating factor behind the International Organizations Immunities Act, *infra.* H.R.REP. No. 1203, 79th Cong., 1st Sess. 2 (1945); S.REP. No. 861, 79th Cong., 1st Sess. 2 (1945).

4. International Organizations Immunities Act § 2(b), 59 Stat. 669 (1945), 22 U.S. C. § 288a (1964). The United States participates in the Inter-American Development Bank pursuant to the Inter-American Development Bank Act, 73 Stat. 299 (1959), 22 U.S.C. § 283 (1964).

5. Exec. Order No. 10873, 25 Fed.Reg. 3097 (1960).

waiver had been otherwise made, it must itself be a waiver of immunity. We do not read it as a venue provision for actions resulting from individual waivers; rather it is a provision waiving immunity and laying venue for the suits permitted. The terms are clear that "actions may be brought against the Bank"; had the drafters intended this clause to be only a venue provision, the language would more likely have provided, in essence, that actions brought against the Bank pursuant to any waiver of immunity could be brought in certain named courts.[6] We conclude the absence of such limitation was purposeful. The subscribing nations were certainly alert to the problem and it was entirely appropriate to resolve the immunity question in the organic law of the Bank rather than leave it to case-by-case decision. That this was a deliberate choice is indicated by the title of Article XI, "Status, Immunities and Privileges," and the fact that the second paragraph of Section 3 expressly prohibits suits by members. The drafters thus manifested full awareness of the immunity problem and we conclude they must have been aware that they were waiving immunity in broad terms rather than treating narrowly a venue problem. Thus we cannot read it in a restrictive sense; we read it as permitting the assertion of a claim against the Bank by one having a cause of action for which relief is available.

Our conclusion on this score is not without support in the historical background of the Bank's creation. For example, in response to questions from the House Committee considering the bill providing for United States participation in the Bank, then Assistant Secretary of the Treasury Upton, who had headed the United States delegation on the drafting committee, submitted a memorandum. In it he assured the Committee that the bill conformed with the Agreement in waiving the right of the United States to sue the Bank. The section of the bill providing jurisdiction for courts in the United States, he said, was not inconsistent with the Agreement's prohibition against suits by members. It had a different function, for "under the agreement, the Bank may be sued by persons other than member countries." [7]

The Special Report of the National Advisory Council on the Proposed Inter-American Development Bank contains a similar description of the Bank's status:

> To carry out its operations the Bank is to have full juridical personality, though actions may not be brought against the Bank by members or persons deriving claims from members. Other legal actions, however, may be brought against the Bank in courts of the countries in which the Bank has an office or has appointed an agent to act for it or has issued or guaranteed securities.[8]

There is another strand to the question of the Bank's immunity that bears notice. In 1960 President Eisenhower issued, as we noted, his Executive Order qualifying the Bank for immunities available under the terms of the International Organizations Immunities Act. In 1962 President Kennedy amended President Eisenhower's Order by another Order, which is entitled as intended "to provide for an exception to the Inter-American Development Bank's immunity from suit specified in the International Organizations Immunities Act." This Order added the following clause to the Eisenhower Order:

> *Provided,* That such designation shall not be construed to affect in any way the applicability of the provisions of Section 3, Article XI, of the Articles of Agreement of the Bank. * * *[9]

---

6. See Article 50 of the Asian Bank Agreement, quoted *infra.*

7. *Hearings on H.R. 7072 and 7073 Before Subcommittee No. 1 of the House Committee on Banking and Currency,* 86th Cong., 1st Sess. 20 (June 3, 4, and 5, 1959).

8. H.R.Doc. No. 133, 86th Cong., 1st Sess. 18 (1959).

9. Exec.Order No. 11019, 27 Fed.Reg. 4145 (1962).

As amended, the Order tracks the Orders qualifying the International Finance Corporation and the World Bank.[10] Its effect could only have been to reinforce the waiver of immunity. The Eisenhower Order qualified the Bank "as a public international organization entitled to enjoy the privileges, exceptions, and immunities conferred by the International Organizations Immunities Act." By the terms of the Act, of course, the Bank enjoys immunity except to the extent that a waiver is shown. But the Kennedy Order removed the force of any argument that the Bank had had immunities conferred upon it by the Act regardless of its waiver. The Kennedy Order stated its purpose to be to provide for an *exception* to immunity, and it did so by decreeing that the designation of the Bank as an international organization entitled to enjoy the immunities conferred by the Act "shall not be construed to affect in any way the applicability of the provisions of Section 3, Article XI" of the Agreement. The only language in Section 3 concerned with exceptions to immunity is the language which we read as a waiver.

The Bank contends that, while Section 3 does waive immunity, it does so only with respect to suits brought by "bondholders, and other like creditors and the beneficiaries of its guarantees." The Bank seems to rest its argument on a broad assurance that it knows "the purpose and effect of the complex of statutory, international agreement and executive order provisions is this." The distinction made by the Bank is surely not necessary, as the Bank suggests it is, to preserve Section 2(b) of the Immunities Act, since that section expressly contemplates waiver.

There is an indication in Section 3 that bondholders have a special status under the agreement. The status conferred however is not that of the Bank's waiver of immunity, but rather the Bank's willingness to defend suits where it "has issued or guaranteed securities" even though venue might not otherwise lie in that jurisdiction. The status is conferred in the phrase which is disjunctively connected with other phrases laying venue—"in the territories of a member in which the Bank has an office, has appointed an agent for purpose of accepting service or notice of process, or has issued or guaranteed securities."

In fact, there are two features of Section 3 that militate against the Bank's argument. First, the drafters of the Agreement indicated that when they wanted to make an exception to waiver of immunity they knew how to do so. Prudently concerned with possible interference in bank operations by member countries, the drafters explicitly and expressly provided in paragraph 2 of Section 3 that *members* could not sue the Bank. This insured that members would not, in the Bank's words, intrude into "essential policy decisions * * * entrusted to its officers and Board." Second, the drafters stated that the Bank could be sued "in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities." They must have contemplated that the Bank would establish offices in the areas intended to be served.[11] Provision for suit in *any* member country where the Bank has an office must have been designed to facilitate suit for some class other than creditors and bondholders, *i. e.*, borrowers; creditors suing to enforce bond obligations would more likely sue in United States Courts.

It is true, as the Bank argues, that the Agreement of the Asian Development Bank limits suit to "cases arising out of or in connection with the exercise of its powers to borrow money, to guarantee

---

10. Exec.Order No. 10680, 21 Fed.Reg. 7647 (1956); Exec.Order No. 9751, 11 Fed.Reg. 7713 (1946).

11. This has in fact occurred; a Bank affidavit in the instant case states that the Bank has its main office in Washington, D.C., Regional Offices in 15 of its member countries, and a special representative in Paris, France.

obligations, to buy and sell or underwrite the sale of securities"[12] and that the Treasury Department stated that the Asian Bank's "immunities, exemptions and privileges * * * are similar to those embodied in the charters of the World Bank and the Inter-American Development Bank."[13] The Department was indeed correct; the agreements of the Inter-American Bank and the Asian Bank are similar with respect to "immunities, exemptions and privileges." But similar does not mean identical, and the difference in language with respect to immunity from suit—only one of many privileges and immunities treated in the two agreements—is quite significant. Article 50 of the Asian Bank Agreement provides:

1. The Bank *shall enjoy immunity* from every form of legal process, *except in cases arising out of or in connection with the exercise of its powers to borrow money,* to guarantee obligations, or to buy and sell or underwrite the sale of securities, in which cases actions may be brought against the Bank in a court of competent jurisdiction in the territory of a country in which the Bank has its principal or a branch office, or has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. (Emphasis added.)

Section 3 of Article XI of the Inter-American Bank Agreement states:

*Actions may be brought* against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. (Emphasis added.)

The Asian Bank Agreement explicitly reserves immunity except for certain situations, which are specifically spelled out. The Inter-American Bank Agreement has no reservation of immunity and mentions no category of cases in paragraph one in which the Bank cannot be sued. After this difference, the language of the two provisions becomes very similar, but the difference is a clear and telling one. It is quite impossible to argue in the face of it that the Inter-American Bank's Agreement implicitly provides an immunity which the Asian Bank's Agreement explicitly sets forth.

In the Memorandum mentioned above in which Assistant Secretary Upton told the House Committee on Currency and Banking that "the Bank may be sued by persons other than member countries," he continued by saying: "To mention one such possibility, the Bank might have a liability to private persons in the United States on bonds which it had issued, and the agreement does not prohibit a suit against the Bank by any such private individual."[14] This is merely an example of a suit that could be brought; indeed Mr. Upton specifically said it was but "one such possibility." This surely does not indicate that suits by creditors were the only ones permissible.

There is no support in the common law doctrine of sovereign immunity for the Bank's argument. The doctrine has developed around the nature and function of the defendant, not the type of action a particular suit represents. No case is cited to us in which the immunity of the sovereign, be it domestic or foreign, depended on the identity of the suitor.

Even if we accepted the rationale of the distinction urged by the Bank as relevant to waiver, it would not necessarily yield the result desired by the Bank. There is no reason to believe that suits by creditors are less harassing to Bank management, or less expensive than are other kinds of suits. Just as it is necessary for the Bank to be subject to

12. Articles of Agreement Establishing the Asian Development Bank, December 4, 1965, Art. 50, par. 1.

13. *Hearing on H.R. 12563 Before Senate Committee on Foreign Relations,* 89th Cong., 2d Sess. 129 (February 16, 1966).

14. *Hearings, supra* note 7, at 20.

suits by bondholders in order to raise its lending capital, it may be that responsible borrowers committing large sums and plans on the strength of the Bank's agreement to lend would be reluctant to enter into borrowing contracts if thereafter they were at the mercy of the Bank's good will, devoid of means of enforcement.[15] Suits by non-member creditors can affect the management of the Bank just as much as suits by borrowers —perhaps more; the Bank may have market power with respect to borrowers that would enable it to insist on loan contracts insulating its management functions, which it may not have with respect to creditors.

■ The Bank tells us that its "loan agreements universally provide that disputes between the Bank and its borrowers are to be submitted to arbitration." However the existence of binding and exclusive arbitration procedure is irrelevant to the issue of immunity from suit. An arbitration provision is by no means inconsistent with a right of suit by borrowers.[16]

The District Judge concluded that "where delicate, complex issues of international economic policy are involved, jurisdiction should be denied." But the complaint does not raise large or delicate international policy issues but rather purports to allege what at best is a simple breach of agreement and possible tort.

■ Turning to this alternative ground, we agree with the District Judge that the complaint does not state a cause of action for which relief is available. Two categories of wrongful acts by the Bank are alleged: lending to competitors and failure to carry out an alleged promise to make a market study before participating in further paper and pulp development loans. The contract between Lutcher and that Bank contains no limitation on the Bank's right to make loans to Lutcher's competitors; no duty exists, independent of contract, which would limit the right of the bank to make such loans.

The complaint alleges that in reliance on the promised market survey Brown personally advanced funds to Lutcher, which made payments due the Bank on its loans. Appellants' brief argues that but for the promised market survey Brown and Lutcher "might not have taken" these actions. Assuming arguendo that the agreement described is not fatally vague, it is not supported by consideration since performance of a preexisting obligation is not consideration. That Brown individually acted to his detriment, as he claims, by advancing additional funds to his corporation is not enough; individually he alleges no contract with the Bank in relation to the financing program. All relations between Lutcher and the Bank rested on formal loan contracts; accordingly Brown's individual action in putting new

---

15. The Bank states that borrowers do not regard it as essential to be able to sue since "the Bank's obligations to its borrowers are discharged, for all practical purposes, when it has disbursed the monies it promised." But that oversimplifies the possible contractual relationships; it also overlooks that the Bank might be accused of not disbursing the promised monies.

16. The Bank has evinced a recognition that arbitration may spawn suit. The contract between it and Lutcher provides, "No recourse shall be available that does not comply with the award." The recourse referred to is most likely judicial.

It is interesting to note the World Bank's view of the relationship between arbitration and immunity since the immunity provision in the World Bank agreement is identical to the Inter-American Development Bank's. Articles of Agreement Establishing the International Bank for Reconstruction and Development (World Bank), Art. VII, Section 3, 60 Stat. 1440, 1457 (1945), T.I.A.S. No. 1502. The loan Regulations of the World Bank specifically provide for judicial enforcement of arbitration (where a government is not involved). Loan Regulations No. 4, February 15, 1961, Art. VII, § 7.04(k); Delaume, *Jurisdiction of Courts and International Loans*, 6 AM.J.COMP.L. 189, 210 (1957).

**461**

funds into his corporation, even if influenced, as his brief argues, by the promised market survey, does not give rise to a cause of action.

Affirmed.