# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 15, 2022               Decided June 3, 2022

No. 21-7047

NOAH J. ROSENKRANTZ, ET AL.,
APPELLANTS

v.

INTER-AMERICAN DEVELOPMENT BANK,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03670)

———

*Gregory J. Wrenn* argued the cause and filed the briefs for appellants.

*Griffith L. Green* argued the cause for appellee.  With him on the brief was *Laura C. Mulherin.*

*Charlotte H. Taylor* and *Ariel N. Volpe* were on the brief for *amici curiae* International Bank for Reconstruction and Development, et al. in support of appellee.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and JACKSON[*], *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Plaintiffs Noah J. Rosenkrantz, Christopher Thibedeau and TTEK Inc. (collectively, the Plaintiffs) sued the Inter-American Development Bank (the IDB or the Bank), alleging that the IDB violated its internal investigatory procedures when investigating allegations that the Plaintiffs had engaged in "Prohibited Practices"—e.g., corruption, fraud, coercion, collusion, obstruction and misappropriation—in the performance of IDB-financed contracts, an investigation that ultimately led to the imposition of severe sanctions against the Plaintiffs. The IDB moved to dismiss the suit for lack of subject matter jurisdiction, asserting immunity under the International Organizations Immunities Act (IOIA), 22 U.S.C. §§ 288–288*l*. The Plaintiffs countered that their case fell within two exceptions to IOIA immunity: the commercial activity exception and the waiver exception. Rejecting the Plaintiffs' arguments, the district court granted the IDB's motion to dismiss. As detailed *infra*, we affirm.

## I. Background

On review of a dismissal order, "[w]e assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)

---

[*] Circuit Judge Jackson was a member of the panel at the time the case was argued but did not participate in the opinion.

(quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). We recite the relevant facts accordingly.

**A.**

The IDB is an international financial institution created by its member countries for "[t]he purpose of . . . contribut[ing] to the acceleration of the process of economic and social development of the regional developing member countries, individually and collectively." *See* Agreement Establishing the Inter-American Development Bank (IDB Charter) art. I, § 1, *opened for signature* Apr. 8, 1959, 10 U.S.T. 3068, *reprinted in* Joint Appendix (J.A.) 0216–54. The IDB fulfills its chartered objective by providing loans and grants to the governments and government-controlled entities located in its borrowing member countries—principally in the Latin American and Caribbean regions—which, in turn, use those resources to fund development activities. *See Rosenkrantz v. Inter-Am. Dev. Bank*, No. CV 20-3670, 2021 WL 1254367, at *1 (D.D.C. Apr. 5, 2021). Forty-eight countries, including the United States, are currently members of the IDB.

The IDB charter requires the bank to "take all necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted, with due attention to considerations of economy and efficiency." IDB Charter art. III, § 9(b). Pursuant to this mandate, the IDB has adopted internal policies prohibiting all parties involved in an IDB-financed project from engaging in "Prohibited Practices," which encompass corruption, fraud, coercion, collusion, obstruction and misappropriation. *See* IDB, Sanctions Procedures (Sanctions Procedures) § 2.2 (2020), *reprinted in* J.A. 148–66. This prohibition extends well beyond "parties who contract with the Bank" to cover "any party involved" in

an IDB-financed project, including, *inter alia*, borrowers, grant recipients, bidders, suppliers, contractors and subcontractors, service providers and financial intermediaries, as well as the officers, employees and agents of these entities. *Id.* § 1.2; *see also id.* § 2.2.

The IDB enforces its prohibition on Prohibited Practices through a multi-step internal review process set forth in the IDB's Sanctions Procedures that is designed to identify and, if necessary, penalize violations. *See generally* Sanctions Procedures §§ 3–14; *see also Rosenkrantz*, 2021 WL 1254367, at *2–3 (describing IDB's sanctions process). First, allegations of Prohibited Practices are referred to the IDB's Office of Institutional Integrity (OII) for investigation. *See* Sanctions Procedures § 3.1. If the OII concludes that "a preponderance of the evidence supports a finding of Prohibited Practice," *id.* § 3.3, it issues a Statement of Charges and Evidence and refers the matter, including all relevant evidence, to an IDB President-appointed Sanctions Officer, *id.* §§ 3.2–3.4; *see also id.* § 10.2, who, like the OII, determines whether "a preponderance of the evidence supports a finding that the Respondent engaged in a Prohibited Practice," *id.* § 4.1. If the Sanctions Officer determines the standard has been met, he provides the respondent and the OII with a "Notice," which consists of, among other things, the Statement of Charges and Evidence, the Sanctions Officer's findings, and a description of possible sanctions; the respondent has sixty days after delivery of the Notice to respond. *Id.* §§ 4.5–4.7. A respondent's failure to respond is deemed an admission of the allegations set forth in the Notice and a waiver of the opportunity to appeal. *Id.* § 4.8.

Once the sixty days are up, the Sanctions Officer evaluates the submissions from the OII and, if any, the respondent. *Id.* § 4.9. If the Sanctions Officer concludes again that a

preponderance of the evidence supports the finding of a Prohibited Practices violation, he may impose an appropriate sanction, *id.* § 4.9.2, which may range from a formal reprimand to debarment—a determination that the respondent is "ineligible, either permanently or for a stated period of time, to be awarded and/or participate in additional contracts for Projects," *id.* § 8.1–8.2. The Plaintiffs characterize debarment as "career-ending" for them, akin to a "Scarlet A." Appellants' Br. 17. Parties subject to sanctions include not only the respondent but also any entity that a respondent owns or controls. Sanctions Procedures § 8.3.

If the respondent makes a submission to the Sanctions Officer during the sixty-day period upon delivery of the Notice, he has forty-five days to appeal the Sanctions Officer's determination to the Sanctions Committee. *Id.* § 6.1. The Committee reviews the entire record that was presented to the Sanctions Officer in order to determine—for, by now, a fourth time—whether a preponderance of the evidence supports a finding that the respondent engaged in a Prohibited Practice. *Id.* § 7.1. If the Committee determines the standard is met, it issues a final decision, which summarizes its findings and sanctions and takes effects immediately. *Id.* § 7.3. The IDB is permitted to disclose the identity of any sanctioned party, along with the imposed sanctions, to borrowers, other international and multinational organizations, governmental authorities and the general public. *Id.* § 14.1.

Importantly, the Sanctions Procedures were "adopted to guide the exercise of discretion" by the IDB and "do not themselves confer any rights or privileges to any parties." *Id.* § 15.1. Moreover, on the issue of immunity, the Sanctions Procedures state that "[n]othing in these Procedures shall be considered to alter, abrogate, or waive the immunities and

privileges as set forth in" the IDB Charter or in other agreements among member countries. *Id.* § 15.2.

**B.**

Over the course of 2010, the IDB entered into two contracts with GreenLine Systems, Inc. (GreenLine)—referred to as the ACRMS Contract and the KCP Contract—to provide customs products to the Government of Barbados. *Rosenkrantz*, 2021 WL 1254367, at *3. At the time, Rosenkrantz was the co-founder, CEO and chairman of GreenLine and Thibedeau was a GreenLine vice president. *Id.* Both contracts, to which neither Rosenkrantz nor Thibedeau was named a contracting party, *id.*; *see* Compl. ¶¶ 26, 32, specified that "no promises, terms, conditions, or obligations other than those contained herein" existed between the IDB and GreenLine and made no reference to the Sanctions Procedures. *Rosenkrantz*, 2021 WL 1254367, at *3; *see* J.A. 0036 (ACRMS Contract); J.A. 0064 (KCP Contract).

In 2013, GreenLine was acquired by A-T Solutions, Inc. (ATS); after the acquisition, Rosenkrantz left the company and Thibedeau stayed on as a vice president of ATS. *Rosenkrantz*, 2021 WL 1254367, at *4. The acquisition was governed by the "GreenLine Purchase Agreement," which, according to the Plaintiffs, obligated ATS and the "GreenLine Securityholders," a group that included Rosenkrantz and Thibedeau, to "cooperate fully with each other in connection with the defense, negotiation or settlement of any Indemnifiable Claim." *Id.* (quoting Compl. ¶ 62). In their view, this agreement contractually obligated ATS, and any successors in interest, to facilitate for the GreenLine Securityholders "the retention and provision of records and information reasonably relevant to such Indemnifiable Claim[s]," as well as access to "employees . . . to provide

additional information and explanation of any material provided." *Id.* (quoting Compl. ¶ 62).

In 2015, the Government of Barbados awarded ATS an IDB-financed contract—referred to as the ESW Contract—for another customs product. *Id*. Again, neither Rosenkrantz, who had already left ATS, nor Thibedeau was a party to the contract. *Id.* Although the IDB was also not a party, the contract required all participants to comply with the IDB's "Applicable Policies in regard to fraud and corruption and prohibited practices." *Id.*; *see* J.A. 0087 (ESW Contract). During the ESW Contract negotiations, ATS was acquired by Pacific Architects and Engineers (PAE). *Rosenkrantz*, 2021 WL 1254367, at *4. After the acquisition, Thibedeau became a PAE employee but left the company in April 2016 and later formed TTEK as a Barbados corporation under his control. *Id.*

At this point, the IDB surmised that something was amiss. In 2015, the OII initiated an investigation of alleged Prohibited Practices in connection with certain IDB-financed contracts, an inquiry that eventually implicated the ACRMS, KCP and ESW Contracts. *See id.* The OII requested documents and information from PAE, which cooperated with the OII investigation. *Id.* According to the Plaintiffs, the "IDB . . . instruct[ed] PAE not to cooperate with the GreenLine Securityholders in relation to the investigation," Compl. ¶ 64, thereby causing PAE to "decline[]" to provide Rosenkrantz and Thibedeau with "records relating to the investigation," *see id.* ¶ 69, in violation of the GreenLine Purchase Agreement. *See Rosenkrantz*, 2021 WL 1254367, at *4; *see generally* Compl. ¶¶ 65–72. In April 2018, three years after beginning its investigation, the OII requested to interview Rosenkrantz and Thibedeau and soon after provided them with approximately 2,500 pages of potentially relevant records, which the Plaintiffs contend was a small fraction of the nearly 300,000 pages they

believe the OII collected from PAE. *Rosenkrantz*, 2021 WL 1254367, at \*5; Compl. ¶ 75. The OII then issued to Rosenkrantz and Thibedeau a show-cause order, alleging that the pair had engaged in Prohibited Practices and outlining the supporting evidence. *Rosenkrantz*, 2021 WL 1254367, at \*5. Shortly before Rosenkrantz and Thibedeau filed their written responses to the show-cause order, the IDB announced that it executed a negotiated resolution agreement with GL Systems—the PAE subsidiary that succeeded GreenLine and ATS's business—that resolved allegations of Prohibited Practices in connection with the three customs contracts and debarred GL Systems for four years. *Id.*

In December 2018, the OII concluded that Rosenkrantz and Thibedeau had engaged in Prohibited Practices and issued a Statement of Charges and Evidence, naming Rosenkrantz and Thibedeau as "Respondents" and designating TTEK as an "[o]ther party subject to sanctions." *Id.* The Statement of Charges included over 6,700 pages of relevant exculpatory or mitigating evidence. *Id.* The matter was referred to a Sanctions Officer, who, in May 2019, issued the Plaintiffs a Notice, which included the Statement of Charges and all relevant evidence; the Plaintiffs submitted their responses in August 2019. *Id.* In May 2020, the Sanctions Officer issued his determination, concluding that Rosenkrantz and Thibedeau had engaged in Prohibited Practices and debarring the pair, along with TTEK, for terms ranging from four to ten years. *Id.* The Plaintiffs then appealed to the Sanctions Committee. *Id.*[1]

On December 14, 2020, the Plaintiffs sued the IDB, alleging that it had violated its Sanctions Procedures by (1) wrongfully instructing PAE not to cooperate with the Plaintiffs

---

[1] The IDB Sanctions Committee eventually affirmed the Sanctions Officer's findings and determinations but reduced Rosenkrantz's term of debarment from ten years to eight years.

and declining the Plaintiffs' requests for all 300,000 pages of documents they believe PAE produced to the OII, *id.*; *see* Compl. ¶¶ 65–79; (2) unfairly pre-determining the Plaintiffs' guilt by settling with GL Systems before the Plaintiffs had submitted their responses to the OII's show-cause letter, *see Rosenkrantz*, 2021 WL 1254367, at \*5; *see* Compl. ¶¶ 78–94; and (3) "wrongfully charg[ing]" TTEK as a party subject to sanctions, *Rosenkrantz*, 2021 WL 1254367, at \*5. From these grievances, the Plaintiffs allege that the IDB breached duties owed the Plaintiffs via the "contractually-imposed Sanctions Procedures" (Count I), violated its implied duty of good faith and fair dealing (Count II) and tortiously interfered with the GreenLine Purchase Agreement (Count III). *See* Compl. ¶¶ 104–19. The Plaintiffs sought preliminary injunctive relief to halt the IDB's then-pending sanctions proceedings. *See Rosenkrantz*, WL 1254367, at \*6.

The IDB moved to dismiss the complaint on the ground of immunity, pursuant to Federal Rule of Civil Procedure 12(b)(1). *Id.* The Plaintiffs opposed, arguing that their case fell within two statutory exceptions to the IDB's immunity—the commercial activity exception, *see* 28 U.S.C. § 1605(a)(2), and the waiver exception, *see id.* § 1605(a)(1); *see also* 22 U.S.C. § 288(a)(b) (IOIA waiver exception). *Rosenkrantz*, WL 1254367, at \*6. The district court granted the IDB's motion to dismiss, finding neither exception applicable to the Plaintiffs' claims. *Id.* at \*16.

The Plaintiffs filed a timely notice of appeal of the district court's dismissal and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Analysis

We review the district court's organizational immunity determinations de novo. *See Odhiambo v. Republic of Kenya*,

764 F.3d 31, 35 (D.C. Cir. 2014). "Where, as here, the 'defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.'" *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) (quoting *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018)).

The IOIA confers upon international organizations like the IDB "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity." [2] 22 U.S.C. § 288a(b). Although we deal here with international organization immunity, the Supreme Court has recently made clear that such immunity is coextensive with the immunity afforded to foreign sovereigns pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1604–1606. *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019) ("[T]he Foreign Sovereign Immunities Act governs the immunity of international organizations."); *id.* at 768 (22 U.S.C. § 288a(b) "is best understood to make international

---

[2] Pursuant to the IOIA, an "international organization" is "a public international organization in which the United States participates . . . and which shall have been designated by the President through appropriate Executive order as being entitled" to immunity under the IOIA. 22 U.S.C. § 288. The United States became a member of the IDB pursuant to the Inter-American Development Bank Act, Pub. L. No. 86-147, 73 Stat. 299 (1959) (codified at 22 U.S.C. §§ 283–283z-13). President Eisenhower subsequently designated the IDB as an IOIA international organization on April 8, 1960. *See* Exec. Order No. 10,873, 25 Fed. Reg. 3,097.

organization immunity and foreign sovereign immunity continuously equivalent").

The FSIA provides that foreign states (and their instrumentalities)—and, by extension, international organizations—are generally "immune from the jurisdiction of the courts of the United States." 28 U.S.C. § 1604; *see LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021). But the presumption is subject to several statutory exceptions, *see* 28 U.S.C. §§ 1605–1605B, 1607, which constitute the sole basis to obtain subject matter jurisdiction of a foreign state. *See Odhiambo*, 764 F.3d at 34. Two exceptions are relevant here. First, immunity is excepted if the action is based (1) "upon a commercial activity carried on in the United States by the foreign state," (2) "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," or (3) "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Second, a foreign state may "waive[] its immunity either explicitly or by implication." *Id.* § 1605(a)(1). The IOIA, like the FSIA, includes a waiver exception, albeit one that recognizes express waiver only. *See* 22 U.S.C. § 228a(b) ("International organizations . . . shall enjoy the same immunity from suit . . . , except to the extent that such organizations may expressly waive their immunity.").

The Plaintiffs contend that their claims satisfy the commercial activity and waiver exceptions to the IDB's immunity. For the reasons below, we disagree on both counts.

## A. Commercial Activity Exception

The FSIA's commercial activity exception, as relevant here, permits suit against an international organization if "the

action is *based upon a commercial activity* carried on in the United States by the [international organization]." 28 U.S.C. § 1605(a)(2) (emphasis added). Here, we ask only whether the Plaintiffs' action is "based upon" commercial activity and conclude that it is not.

To determine whether a plaintiff's action is based upon commercial activity, we must first identify "the 'particular conduct' that constitutes the 'gravamen' of the suit," *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 357 (1993)), "zero[ing] in on the core of [the plaintiff's] suit," that is, the "wrongful conduct" that "led to [the] injuries suffered," *id.*; *see also Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409 (D.C. Cir. 2021). The mere fact that an activity "led to the conduct that eventually injured" the plaintiff does not necessarily make that activity the gravamen of the suit, *see Nelson*, 507 U.S. at 358, and neither does the fact that an activity "would establish a single element of a claim," *Sachs*, 577 U.S. at 34. As the Supreme Court has stressed, "any other approach would allow plaintiffs to evade the [FSIA]'s restrictions through artful pleading." *Sachs*, 577 U.S. at 36; *see also Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017) ("What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading.").

The Plaintiffs assert that the gravamen of their action is the IDB's "violation of the Bank's contractual duties, while investigating and administering disciplinary procedures that apply by commercial contract terms to the conduct of private commercial suppliers and their personnel in the United States in relation to the contracts." Appellants' Reply Br. 19–20. Yet, despite framing their claims in contractual terms—relying on the three IDB-financed contracts and the associated bid solicitations—the Plaintiffs' complaint, as the district court

correctly recognized, makes clear that the wrongful conduct that in fact injured them centers around how the IDB carried out the Sanctions Procedures. *See Rosenkrantz*, 2021 WL 1254367, at *10. The injurious conduct recounted in Count I includes "blocking Plaintiffs' access to historical records of GreenLine necessary to prepare a defense," "failing to provide Plaintiffs access to records provided to IDB by PAE" and to "documents that may be exculpatory or mitigating in nature," "publicly issuing a press release including information that would identify Plaintiffs" and "pre-judging the responsibility of Plaintiffs (by publicly announcing vicarious sanctions against another entity) without first providing Plaintiffs the opportunity to be heard on the charges." Compl. ¶ 107; *see also id.* ¶ 112 (recounting largely identical injuries in Count II); *id.* ¶ 118–19 (characterizing IDB's instruction to PAE "not to provide . . . cooperation or records to the [Plaintiffs]" as "intentional interference" with GreenLine Purchase Agreement); *Rosenkrantz*, 2021 WL 1254367, at *5 (acknowledging Plaintiffs' argument that the IDB "wrongfully charged" TTEK as party subject to sanctions). These alleged injuries arose when the IDB "violat[ed] or act[ed] without authority under the Sanctions Procedures." Compl. ¶ 107. Thus, the alleged wrongful conduct has very little, if anything, to do with the IDB-financed contracts. At bottom, the Plaintiffs are seeking "greater procedural fairness in IDB's investigation and prosecution of the charges against them, not the specific performance of an enumerated duty under one of the three challenged contracts." *Rosenkrantz*, 2021 WL 1254367, at *10. The fact that the Plaintiffs nevertheless styled their causes of action as contract or contract-related claims is of no consequence in light of the substance of their complaint. *See Sachs*, 577 U.S. at 36.

Attempting to re-center the gravamen on the three IDB-financed contracts, the Plaintiffs contend that the commercial

activity exception's "based on" requirement is satisfied whenever a commercial activity—say, a contract—forms "a necessary element of [a] plaintiff's claim." Appellants' Br. 42–43 (citing *Odhiambo v. Republic of Kenya*, 764 F.3d 31 (D.C. Cir. 2014), and *Kirkham v. Société Air France*, 429 F.3d 288 (D.C. Cir. 2005)). But the Supreme Court squarely rejected this "single-element" approach to the gravamen analysis in *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), a decision postdating this Court's decisions in *Kirkham* and *Odhiambo*. In *Sachs*, the plaintiff had purchased a Eurail train pass in the United States and was later injured at a government-owned train station in Austria. 577 U.S. at 30. She attempted to sue Austria's railway operator and avail herself of the commercial activity exception by arguing that her purchase of the Eurail pass, a single element of her claim, involved commercial activity. *Id.* at 35–36. The Ninth Circuit agreed, relying in part on the same single-element approach this Court adopted in *Kirkham*:

> Because the sale of the Eurail pass is an essential fact that Sachs must prove to establish her passenger-carrier relationship with OBB, a nexus exists between an element of Sachs's negligence claim and the commercial activity in the United States. *See Kirkham*, 429 F.3d at 292 ("[S]o long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies . . . .").

*Sachs v. Republic of Austria*, 737 F.3d 584, 600 (9th Cir. 2013) (en banc) (alteration in original).

The Supreme Court rejected the Ninth Circuit's single-element test as unnecessarily requiring "an exhaustive claim-

by-claim, element-by-element analysis" of a cause of action. *Sachs*, 577 U.S. at 34. It directed courts to instead examine the plaintiff's asserted claims and "zero[] in on" the wrongful conduct on the part of the defendant that "actually injured" the plaintiff. *Id.* at 35. This is precisely what we have done here by identifying the IDB's alleged non-adherence to the Sanctions Procedures—not the breach of any provision in the IDB-financed contracts—as the source of the Plaintiffs' injuries. To the extent that either *Kirkham* or *Odhiambo* may have left the door open for a single-element approach to the gravamen analysis, whereby a plaintiff's pleading decisions could dictate a court's jurisdiction, *Sachs* has since slammed it shut.[3]

Having identified the gravamen of the Plaintiffs' action—the IDB's alleged non-adherence to the procedures set forth in the Sanctions Procedures—we must next determine whether it constitutes "commercial activity" under the FSIA. 28 U.S.C. § 1605(a)(2). An international organization "engages in commercial activity . . . where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Nelson*, 507 U.S. at 360 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)); *see also de Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) ("[A] foreign state's repudiation of a contract is precisely the type of activity in which a 'private player within the market' engages." (quoting *Nelson*, 507 U.S.

---

[3] As for *Odhiambo*, this Court simply confirmed *Kirkham*'s adoption of a single-element approach to the gravamen analysis, iterating that "the alleged commercial activity must establish 'a fact without which the plaintiff will lose.'" *Odhiambo*, 764 F.3d at 36 (quoting *Kirkham,* 429 F.3d at 292); *see id.* ("[A] claim is 'based upon' commercial activity if the activity establishes one of the 'elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.'" (quoting *Nelson,* 507 U.S. at 357)). Thus, *Odhiambo*, like *Kirkham*, is of no help in light of *Sachs*.

at 360)). Simply put, if the alleged conduct is not "typically performed by participants in the market," it is not commercial activity under the FSIA. *Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) (quoting *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994)). The question "whether a state acts 'in the manner of' a private party is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360 (quoting *Weltover*, 504 U.S. at 614); *see* 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").

As we see it, the IDB's application of its Sanctions Procedures is not the sort of activity "typically performed by participants in the market" but rather more akin to those powers exercised by a sovereign. *Mwani*, 417 F.3d at 17 (quoting *Cicippio*, 30 F.3d at 168). The IDB is mandated by charter—or, more accurately, a multilateral agreement of forty-eight member nations—to "take the necessary measures to ensure that" bank funds "are used only for the purposes for which" they are allocated, "with due attention to considerations of economy and efficiency." IDB Charter art. III, § 9(b). In accordance with this mandate, the IDB uses its Sanctions Procedures, and the threat of debarment, to identify, root out and deter fraud and waste in the use of public funds, in the same manner as many sovereigns, including the United States, *see generally* 48 C.F.R. subpart 9.4 (debarment procedures for federal contractors and subcontractors), and the European Union, *see* Council Directive 2014/24, art. 57, 2014 O.J. (L 121) 127–29 (EU) (grounds for "exclud[ing] an economic operator from participation in a procurement procedure"). *See Rosenkrantz*, 2021 WL 1254367, at *12.

Granted, the Plaintiffs are correct that private market actors use similar investigatory and disciplinary tools to root

out internal fraud but their proffered examples involve actions by private institutions to investigate and discipline parties with whom they have a direct contractual relationship, often to simply terminate or limit existing rights under that relationship. *See* Appellants' Br. 38–40 (citing *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 175 (D.D.C. 2016) (demotion of professor and closure of his laboratory for misconduct related to scientific research)). The IDB's investigatory and disciplinary power, as encapsulated in the Sanctions Procedures, is derived from its charter, not a singular and discrete contractual relationship, *see* IDB Charter art. III, § 9(b), and the Sanctions Procedures permit the IDB to take disciplinary action against *any* party involved with an IDB-financed contract, regardless of the existence of a contractual relationship with the IDB, *see* Sanctions Procedures §§ 1.2, 8.3. Further still, debarment effectively removes a private party from the market for IDB or IDB-financed contracts and could result in "cross-debarment" with other development banks, governments and private parties, thereby excluding it from the entire market. *See* Appellants' Br. 17. The IDB's ability to exercise such influence over a wide array of parties and markets—potentially to the point of total exclusion of a particular party from the market—plainly constitutes the exercise of a "power[] peculiar to sovereigns." *Weltover*, 504 U.S. at 614.

In short, the gravamen of the Plaintiffs' action—the IDB's alleged failure to adhere to the Sanctions Procedures—is not commercial activity within the scope of the FSIA. The IDB's mandate under its charter and the Sanctions Procedures to protect the integrity of its funds and regulate the market for international development funds is much more akin to a sovereign's effort to do the same than to that of a private party. The commercial activity exception therefore does not abrogate the IDB's immunity from the Plaintiffs' claims, as the district

court correctly concluded. *See Rosenkrantz*, 2021 WL 1254367, at \*14.

**B. Waiver Exception**

Failing to find refuge in the commercial activity exception, the Plaintiffs contend that the IDB nevertheless waived its immunity by virtue of its charter. The Plaintiffs point to Article XI, section 3, which provides, in relevant part:

> Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issues or guaranteed securities. No action shall be brought against the Bank by member or person acting for or deriving claims from members.

IDB Charter, art. XI, § 3.

This appeal is not the first time our Court has interpreted Article XI, section 3 of the IDB Charter. In *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335 (D.C. Cir. 1998), *abrogated on other grounds by Jam*, 139 S. Ct. 759, the Court specifically interpreted Article XI, section 3 of the IDB Charter as a limited waiver of immunity, "not a blanket waiver of immunity from every type of suit not expressly prohibited elsewhere in the articles of agreement." *Id.* at 1338.[4] We relied heavily on our

---

[4] Although the Supreme Court abrogated *Atkinson*'s holding that international organizations possessed absolute immunity under the IOIA, *see Jam*, 139 S. Ct. at 770–71, 772, it denied certiorari on the waiver issue. *See* Petition for a Writ of Certiorari, *Jam v. Int'l Fin. Corp.*, No. 17-1011 (Jan. 19, 2018), *granted in part by* 138 S.

earlier decision in *Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983), which declined to read "an identical waiver provision" as "evincing an intent by the members of the Bank to establish a blanket waiver of immunity from every type of suit not expressly prohibited." *Id.* at 614–15; *see also Vila v. Inter-Am. Investment Corp.*, 570 F.3d 274, 278–79 (D.C Cir. 2009) (similarly interpreting "nearly identical" language in Inter-American Investment Corporation's charter). Instead, the Court construed section 3 as waiving immunity only if the IDB receives a corresponding benefit: "[T]he [organization]'s immunity should be construed as *not waived* unless the particular type of suit would *further* the [organization]'s objectives." *Atkinson*, 156 F.3d at 1338 (emphases in original); *see also Mendaro*, 717 F.2d at 617 ("A nonspecific waiver . . . should be more broadly construed when the waiver would arguably enable the organization to pursue more effectively its institutional goals."). The corresponding benefit test therefore asks "whether a waiver of immunity to allow this *type* of suit, by this *type* of plaintiff, would benefit the organization over the long term." *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009) (emphases in original) (citing *Atkinson*, 156 F.3d at 1338, and *Mendaro*, 717 F.2d at 618). But even if the organization accrues benefits as a result of judicial scrutiny, immunity is not waived if such benefits "would be substantially

---

Ct. 2026, 2025 (2018); *Jam*, 3 F.4th 405, 411 (D.C. Cir. 2021) (noting partial denial of certiorari). Thus, *Atkinson*'s waiver holding still controls. *See United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) ("When the Supreme Court vacates a judgment of this court without addressing the merits of a particular holding in the panel opinion, that holding 'continue[s] to have precedential weight, and in the absence of contrary authority, we do not disturb' it." (alteration in original) (quoting *Action All. of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991)).

outweighed by the burdens caused by judicial scrutiny" of the organization's operations. *Mendaro*, 717 F.2d at 617.

In the context of a multilateral bank like the IDB, the Court has generally looked to whether waiver of immunity serves to "enhance the marketability" of an international organization's financial products "and the credibility of its activities in the lending markets." *Mendaro*, 717 F.2d at 618. From this view, waiver may encourage commercial parties to partner with a multilateral bank like the IDB by providing "reassurance" that its partners "would be fairly compensated" if their contracts with the bank fail. *See Vila*, 570 F.3d at 282; *see also Osseiran*, 552 F.3d at 840. For example, allowing unjust enrichment claims brought by independent consultants "would mitigate possible hesitancies" by commercial parties "to negotiating and entering into formal contracts" with the organization. *See Vila*, 570 F.3d at 282; *cf. Osseiran*, 552 F.3d at 840 (permitting claims arising out of "sales agreements" with an organization to proceed "might help attract prospective investors by reinforcing expectations of fair play"); *Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454, 456–57 (D.C. Cir. 1967) (finding waiver of immunity from suit by debtors to enforce loan agreement with organization). In contrast, permitting judicial review of an international organization's internal affairs—such as the organization's employment practices—would yield the organization no conceivable benefit and would likely hamstring the fulfillment of its chartered mandates. For example, in *Atkinson*, this Court concluded that permitting a wage garnishment action against an IDB employee to proceed would "provide[] no conceivable benefit in attracting talented employees" and therefore would not "*further* the Bank's objectives." 156 F.3d at 1338 (emphasis in original); *see also Mendaro*, 717 F.2d at 618–20 (declining to find waiver of immunity from World Bank employee's sexual harassment and discrimination suit as doing so "would lay the

Bank open to disruptive interference with its employment policies" and "obstruct[] . . . the Bank's purposes").

The Plaintiffs seize upon this surface-level dichotomy in our case law and attempt to fit their claims in the first category, casting themselves as commercial partners with the IDB by virtue of the three IDB-financed contracts and proposing that allowing their suit to proceed would benefit the IDB's organizational interests by easing commercial parties' worry that the IDB "is beyond judicial process for bad faith handling" of its Sanctions Procedures. Appellants' Br. 35. But, as the district court correctly noted, the Plaintiffs' "mere identity as 'commercial partners' of an international organization" is largely irrelevant. *Rosenkrantz*, 2021 WL 1254367, at *16. Our precedent may "draw[] a distinction between external activities and the internal management of international organizations" but it does not "create[] an artificial category of waived claims" and "[t]he court still is required to engage in a weighing of the benefits and costs that a waiver may entail." *Vila*, 570 F.3d at 281.

Weighing the costs and benefits here, we see no reason to find a waiver of immunity. It is true that the IDB is obligated to, among other things, "promote the investment of public and private capital for development purposes" and "encourage private investment," IDB Charter art. I, § 2(a), meaning that the Plaintiffs' argument that judicial review would assuage commercial partners' "fears that [the Sanctions Procedures] will be applied in bad faith," and thereby promote investment, is, at the very least, colorable, Appellants' Br. 35–36; *see Osseiran*, 552 F.3d at 840 ("The thought was that parties may hesitate to do business with an entity insulated from judicial process; promises founded on good faith alone are worth less than obligations enforceable in court."). Yet even if this purported benefit is well-founded, permitting judicial scrutiny

of IDB sanctions proceedings would simultaneously *conflict* with the IDB's mandate to "take all necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for purposes for which the loan was made, *with due attention to considerations of economy and efficiency*." IDB Charter art. III, § 9(b) (emphasis added). One can reasonably foresee future subjects of sanctions proceedings "halt[ing] or delay[ing] those proceedings by filing suits in the courts of the IDB's member countries," thereby frustrating the IDB's ability to "expeditiously root[] out corruption in its projects" and "safeguard[] its funds" with any sort of economy and efficiency. *Rosenkrantz*, 2021 WL 1254367, at \*16. This would be especially true if such suits are, over time, brought in the courts of different IDB member states, potentially leading to inconsistent judgments and directives. *Cf. Broadbent v. Org. of Am. States*, 628 F.2d 27, 35 (D.C. Cir. 1980) ("Denial of immunity opens the door to divided decisions of the courts of different member states passing judgment on the rules, regulations, and decisions of the international bodies."). Thus, the Plaintiffs' proffered benefit is substantially outweighed by the burdens caused by judicial scrutiny and we, like the district court, are compelled to conclude that Article XI, section 3 of the IDB Charter should not be construed to waive the IDB's immunity from the Plaintiffs' claims. *See Rosenkrantz*, 2021 WL 1254367, at \*16.

The Plaintiffs, for their part, contend that we should look not to *Atkinson* and *Mendaro* but rather to an even earlier decision of our Court that interpreted Article XI, section 3 of the IDB Charter: *Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967). The Plaintiffs primarily point to the following language in *Lutcher* with reference to Article XI, section 3:

> The drafters thus manifested full awareness of the immunity problem and we conclude they must have been aware that they were waiving immunity in broad terms rather than treating narrowly a venue problem. Thus we cannot read it in a restrictive sense; we read it as permitting the assertion of a claim against the Bank by one having a cause of action for which relief is available.

382 F.3d at 457. As the Plaintiffs see it, section 3 waives immunity broadly, meaning that *Lutcher* is irreconcilable with the narrower corresponding benefit test outlined in *Mendaro* and *Atkinson* and, being the earlier of the three decisions, should control. Appellants' Br. 29–30; *see also Vila v. Inter-Am. Inv. Corp.*, 583 F.3d 869, 870–71 (D.C. Cir. 2009) (order denying rehearing en banc) (statement of Williams, J.) (finding *Lutcher* and *Mendaro* "impossible to reconcile").

It is true that "when a conflict exists within our own precedent, we are bound by the earlier decision." *United States v. Old Dominion Bd. Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011). But we should not be hasty to "discard a later precedent that distinguished—or is distinguishable from—an earlier decision." *Id.* Accordingly, we decline to act with such haste.

First, a brief sketch of *Lutcher*: An IDB debtor alleged that the IDB breached a loan agreement and argued that section 3 waived the IDB's immunity from the suit. 382 F.2d at 455–56. Noting that section 3 was "hardly a model of clarity," the Court nonetheless concluded that it presented either a venue provision or a waiver provision and adopted the latter interpretation. *Id.* at 456–47. Noting further that other sections of Article XI expressly reserved immunity in certain contexts, such as by barring suit by the IDB's members, the Court

concluded that "[t]he drafters . . . must have been aware that they were waiving immunity in broad terms rather than treating narrowly a venue problem" and read section 3 "as permitting the assertion of a claim against the Bank by one having a cause of action for which relief is available." *Id.* at 457. The Court therefore rejected the IDB's contention that section 3 limited any waiver to "suit[s] by bondholders, creditors, and beneficiaries of its guarantees, on the theory that in such cases vulnerability to suit contributes to the effectiveness of the Bank's operation." *Id.* at 456. In doing so, the Court found that suits brought by debtors were just as necessary as those brought by creditors, given that "responsible borrowers committing large sums and plans on the strength of the Bank's agreement to lend would be reluctant to enter into borrowing contracts if thereafter they were at the mercy of the Bank's good will, devoid of means of enforcement." *Id.* at 459–60.

On the surface, it would appear that *Lutcher*'s broad interpretation of section 3 would be fatal to the IDB's immunity defense. But if we dig a little deeper—as this Court has done in the past—we find this superficial reading of *Lutcher* unfounded. In *Lutcher*, the plaintiff was the IDB's debtor and the IDB argued that any waiver of immunity under section 3 was limited to bondholders and other creditors, not debtors. *Id.* at 455–56. The Court thus treated the issue on those terms— creditor versus debtor. *See id.* at 458 ("Provision for suit in any member country where the Bank has an office must have been designed to facilitate suit for some class other than creditors and bondholders, i.e., borrowers[.]"); *id.* at 459 (citing congressional testimony from U.S. State Department official asserting, as "one . . . possibility," IDB "might have a liability to private persons in the United States on bonds which it had issued" and concluding such testimony "does not indicate that suits by creditors were the only ones permissible" (internal quotation marks and citation omitted)). In doing so, we

25

declined to define immunity according to "the identity of the suitor," including a creditor or a debtor, or "the type of action a particular suit represents," whether it be a bondholder seeking to enforce bond obligations or a debtor seeking to enjoin the Bank from acting contrary to the terms of a loan agreement. *Id.* at 459. Moreover, the Court acknowledged the same functional approach taken later in *Mendaro* and *Atkinson*: "[T]he doctrine" of sovereign immunity "has developed around the nature and function of the defendant."[5] *Id.* at 459; *see also id.* at 459–60 ("Even if [the Court] accepted . . . the distinction" between creditor versus debtor, "it may be that responsible borrowers . . . would be reluctant to enter into borrowing contracts if thereafter they were at the mercy of the Bank's good will, devoid of means of enforcement"). *Lutcher* therefore has much in common with cases like *Vila* and *Osseiran*, which applied the corresponding benefit test to find a waiver of immunity.

*Mendaro*, for its part, acknowledged *Lutcher* and discussed it on its decidedly narrower facts and posture. The

---

[5] At the time of *Lutcher*, the international legal community similarly embraced the functional necessity doctrine—i.e., the principle that international organizations should possess at least the minimum immunities necessary to perform their chartered functions—as a theoretical limitation on organizational immunity. *See, e.g.*, Restatement (Second) of the Foreign Relations Law of the United State § 83 (Am. Law. Inst. 1965) ("An international organization has such immunity from the jurisdiction of a member state to prescribe or enforce rules of law *as is necessary for the fulfillment of its purpose as they are stated in its constitution*.") (emphasis added); Josef L. Kunz, *Privileges and Immunities of International Organizations*, 41 Am. J. Int'l L. 828, 847 (1947) ("The functional principle as the basis" of international organization immunity is "almost universally recognized," the "raison d'être" of immunity).

Court concluded that "[a]lthough the [*Lutcher*] court construed" section 3 "broadly enough to uphold its jurisdiction, the action clearly arose out of the Bank's external lending activities," namely "suits by the Bank's borrowers," when waiver of immunity "would directly aid the Bank in attracting responsible borrowers." *Mendaro*, 717 F.2d at 620; *see also Vila*, 583 F.3d at 869–70 (order denying rehearing en banc) (statement of Rogers, J.) (*Mendaro* "did not overlook *Lutcher*" but rather clarified its scope). The Court reasoned that *Lutcher*'s purportedly broad reading of a waiver provision like Article XI, section 3 is "logical only if the waiver provisions are read in a vacuum, without reference to the interrelationship between the functions of the [international organization] set forth in [its charter] and the underlying purposes of international immunities"; it instead elected to construe such a waiver provision to the extent the international organization "intended to waive . . . immunity from suits by its debtors, creditors, bondholders, and those other potential plaintiffs to whom the [it] would have to subject itself to suit in order to achieve its chartered objectives." *Mendaro*, 717 F.2d at 615. *Atkinson* subsequently observed *Mendaro*'s "reject[ion]" of the broad reading of *Lutcher*, *see Atkinson*, 156 F.3d at 1338, and our later decisions have similarly acknowledged the narrower understanding of *Lutcher*'s holding, *see, e.g.*, *Osseiran*, 552 F.3d at 840 (citing *Lutcher* in support of the proposition that "parties may hesitate to do business with an entity insulated from judicial process"); *Vila*, 570 F.3d at 279 (doing same); *see also Sampaio v. Inter-Am. Dev. Bank*, 806 F. Supp. 2d 238, 244 (D.D.C. 2011) (characterizing *Lutcher* as holding Inter-American Development Bank "may be sued by a debtor to enforce a loan agreement"), *aff'd*, 468 F. App'x 10 (D.C. Cir. 2012).

Thus, if we were to give significant weight to *Lutcher*'s sweeping conclusion that Article XI, section 3 of the IDB

Charter "permit[s] the assertion of a claim against the Bank by one having a cause of action for which relief is available," 382 F.2d at 457, we would run the risk of needlessly and inadvisably transforming dicta into a holding. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("[I]t is not only the result but also those portions of the opinion *necessary* to that result by which we are bound.") (emphasis added); *Doe v. Fed. Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) ("[B]inding circuit law comes only from the holdings of a prior panel, not from its dicta." (quoting *Gersman v. Grp. Health Ass'n*, 975 F.2d 886, 897 (D.C. Cir. 1992)).

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered*.